[Crim. No. 634.    Fourth Dist.    June 26, 1945.]

THE PEOPLE, Respondent, v. HENRY LEE JOHNS, Appellant.

Joseph Seymour for Appellant.

Robert W. Kenny, Attorney General, John Neblett, District Attorney, and H. M. Dougherty, Deputy District Attorney, for Respondent.

GRIFFIN, J.—Defendant and appellant Henry Lee Johns was originally charged jointly with defendant Hiram Goodwin with the crime of robbery. It is alleged in the information that on September 10, 1944, they did unlawfully "take personal property, to wit: gasoline ration coupons, and approximately twelve (12.00) Dollars, lawful money of the United States from the person and immediate presence of Doyle W. Copeland, said coupons and money being then and there in the possession of Doyle W. Copeland, and said taking being against the will of Doyle W. Copeland and accomplished by means of force and fear." Defendants were duly arraigned on the charge. Defendant Johns's attorney demurred to the information and moved to set it aside on the grounds that the facts stated therein did not constitute a public offense, did not comply with sections 950, 951 and 952 of the Penal Code, and that the evidence taken at the preliminary examination was insufficient to hold the defendants to answer on the charge specified. The motion was denied and the demurrer overruled. A motion was made by defendant Johns for a separate trial. This motion was also denied. Defendant Floyd Tatum was later charged in a separate information with the same crime growing out of the same claimed robbery. It alleged the robbery to have occurred on September 11, 1944. After his arraignment and plea of not guilty the district attorney moved to consolidate the two cases for trial. The motion was granted. On the day of the trial the district attorney moved to amend the information to change the alleged date of the robbery from the 10th to the 11th day of September. Over objections, the court ordered the information amended. Counsel for Johns then moved to continue the matter for the purpose of again filing a motion to set aside the amended information

and for hearing the demurrer thereto. The motion was denied. On the day fixed for the joint trial of all of the defendants no objection was made to such joint trial. A jury was selected and accepted by counsel for each defendant. After the People rested their case defendants Johns and Goodwin refused to testify. They rested and moved for a directed verdict of not guilty. One of the grounds was that neither Johns nor his counsel were present when his case was consolidated with Tatum's case for trial and that he (defendant Johns) did not consent thereto. The motion was denied. This is the first objection made by defendant Johns to such consolidation. This is one of the points raised on this appeal. In support thereof he cites *People* v. *Davis*, 42 Cal.App.2d 70 [108 P.2d 85], and *People* v. *Duane*, 21 Cal.2d 71 [130 P.2d 123].

After trial, the jury returned a verdict of guilty of robbery of the second degree as to defendants Johns and Goodwin and a verdict of not guilty as to defendant Tatum. Defendant Johns appealed.

The charge against the defendants was for the same crime, committed on the same day, and all growing out of the same transaction. Section 954 of the Penal Code vests in the trial court the discretion of ordering consolidated for the purpose of trial two or more indictments where the offenses are of the same class.

In *People* v. *Aguinaldo*, 3 Cal.App.2d 254 [39 P.2d 505], it was held that a consolidation of two separate informations against different defendants was error but that the error was one of procedure and therefore section 4½ of article VI of the Constitution had application. That case was followed by *People* v. *Shepherd*, 14 Cal.App.2d 513 [58 P.2d 970], which case involved different defendants separately charged with the same offense. There, no objection to the consolidation of the trials was made and the appellate court reached the same conclusion. Assuming the objection here made to be in proper form, it comes too late to be considered on this appeal. The objection was first made 3½ days after the trial had commenced. It is urged that since defendant Tatum elected to take the stand and testify, and because statements made by Tatum to the officers and court reporter were admitted in evidence, which statements involved the other defendants in the case, it was error to consolidate the cases. The trial court, on five different occasions, admonished the jury that any statements made by a defendant, not in the hearing

of his codefendant, were not binding upon the latter. An examination of the record in the instant case discloses the trial court did not abuse its discretion in making the order of consolidation. Each defendant had a fair and impartial trial. It is clear that the consolidation of the two cases for trial was not prejudicial error. ▮ A defendant should not be allowed to proceed to trial without any objection to consolidation and then, upon resting his case, urge for the first time that an error occurred. The cases cited by defendant are factually different and have no application here.

▮ The next point involves the sufficiency of the evidence to support the verdict and judgment. We will therefore give a résumé of the facts established by the evidence supporting the verdict.

The complaining witness, Copeland, testified that he had worked for an oil company as truck driver; that on September 11, 1944, he made deliveries to a Mr. Wallace of gasoline and received "T" and "R" ration stamps therefor. Twenty-six "R" stamps were identified as being a part of the stamps received, which bore Wallace's signature. He then testified that a "C" ration book was personally issued to him; that on that day he went to Checkies Cafe at about 8 p. m. and that he had not checked in the ration tickets which he obtained from Wallace but that he had them with him in his wallet in his hip pocket; that he had with him other ration stamps representing six or seven hundred gallons, consisting of "A," "T" and "R" stamps; that he went into Checkies Cafe and had a beer and while drinking it he talked to a man whom he did not know but identified him as being the defendant Johns; that he bought Johns a .beer and took the money out of his wallet where the coupons were; that he and Johns then left Checkies Cafe and went to Danny's Cafe, arriving there about 9 p. m.; that while there both men went out and sat in a car owned by Floyd Tatum; that in this car was Copeland, Johns, and Tatum; that Johns and Tatum wanted to buy some gasoline coupons and that he told them if they would buy him a drink he would sell them some; that Johns thereupon went into the cafe and brought out a glass of wine which the witness consumed; that he then told Johns and Tatum that he would have to have another drink before he would sell any stamps; that an argument then ensued and he stated that if they were going to argue all night he was going home; that he then got out on the right-hand side of Tatum's car and walked over to

his car, which was parked eight or nine feet away and started to get in; that he (Copeland) then felt three blows, which knocked him down, one blow striking his mouth, causing it to be split and cut; that while he was on the ground he raised up and heard a motor racing and mentally took note of the license number of the car, which drove away; that he thought the license number was 1-T 1124, or 42, and he told the police officers he might have the numbers shuffled; that he thereupon drove to the police station and made a report; that while at the police station he discovered that two wallets and his watch were missing. In one wallet he had his ''C'' gasoline ration book and other personal papers; that he carried his wallet and billfold in his left pocket; that in the other wallet he had between eight and eleven dollars, the company's ration stamps, his operator's license, and military pass; that all of his property was taken from him against his will and by force; that he had started drinking that day after 5 p. m. He admitted that at 8 p. m. he was under the influence of liquor. He denied receiving $5 which Floyd Tatum claims he paid him for the gasoline stamps. He further stated that he did not know which one had hit him as he was getting into his car and someone pulled him out and struck him to the ground; that he told the officers that he believed that there were two colored men and a soldier present at the time of the robbery; that he remembered seeing one of his billfolds when he was in the cafe and remembered putting it back in his pocket; that he remembered seeing the other billfold earlier in the evening when he bought some gasoline. Copeland further testified that the night before the trial he received a telephone call from the defendant Johns who told him ''Just to get on the stand here and say nothing.''

A police officer testified that he saw Copeland at 10 o'clock in the evening at the police station on September 11; that when he saw him there were blood marks on the front of his shirt and his upper lip was swollen quite a bit; that there were marks of blood on the end of his nose and a couple of scratches on his face.

Another officer testified that he went over to Danny's Cafe in the police car and rode around in the vicinity; that he saw a maroon colored car traveling toward them containing the numbers and letter of 1-T 12; that he commanded the car to stop but instead of stopping it speeded up and continued south for a distance of 40 yards; that it then turned into an

alley and went west; that he pursued it but was unable to find it; that later an officer returned and found a black fender pant in the alley where the maroon car was traveling; that a short time later the officers observed a dark maroon car parked which had a right fender pant of the same color and description missing; that the license number of that car was 1-T 1242; that the officers went to the Tatum home; that just as they arrived at the house the front door slammed and a man came out; that they turned the flashlight on him and at the point of a gun told him not to move; that this man was the defendant Henry Lee Johns; that the officer then ordered Johns to the police car and placed him in the rear seat with Copeland; that an officer then went in the house and found Floyd Tatum changing his shirt; that from the house the two officers and Tatum went to the police car; that as the parties left in the police car Tatum was seated in the middle of the front seat. In the back seat was Copeland and Johns.

One officer testified that Johns turned to Copeland and out of a clear sky said: "You know I wasn't the one that hit you. You know Damn well I didn't hit you"; that after arriving at the police station all of the parties left the car and went inside; that Johns was searched and there was taken from his left-hand shirt pocket a gasoline ration book which was issued to Copeland; that after the officer took the gasoline ration book, Copeland looked at it and said, in Johns's presence: "This is my gas ration book, my personal coupon book"; that Copeland then looked at Johns and said: "You said you weren't up there, you didn't have anything to do with this . . . what are you doing with my gas coupon book in your pocket?"; that to this accusation Johns did not say a word. The officer testified that in his opinion, when he saw Copeland, that Copeland was sober. After the ration book was found on Johns's person, an officer testified that Copeland said in Johns's presence that Johns was the man who struck him three times; that when this accusation was made Johns did not reply to the statement.

Another police officer testified that when he went to the home of Tatum he told Tatum that he was wanted on suspicion of being involved in a strong-armed robbery; that Tatum told the officer that he did not know anything about it.

A detective lieutenant testified that on October 17, 1944, he went to the Tatum house after having had a conversation with Tatum in the police department; that in the conversa-

tion Tatum had first said that he did not know where the stamps were but that he later admitted he had the gasoline stamps at home and said that he had given them to his brother; that these stamps were later produced by his brother and delivered to the police officer; that these stamps were the twenty-six "R" stamps bearing the name of Wallace. The officer then testified that after the stamps were recovered, a statement was taken from Tatum in which he stated that he and Goodwin went to Danny's Cafe; that while they were in the cafe Johns came in with Copeland and that Johns motioned to him and said: "This man has got some stamps; let's get them"; that Goodwin said: "I will hit him"; that Copeland, Johns and Tatum then left the cafe and went to the Tatum house where Tatum procured $5 and that all the men then returned to Danny's Cafe; that when they returned, Goodwin was standing outside of Danny's Cafe; that later Copeland said: "I am going home"; that he started to get in his car; that Tatum saw Goodwin and Johns wrestling with Copeland on the ground but did not see whether or not a billfold was taken at that time; that after they had driven away from Danny's Cafe they parked the car, and the stamps were divided among Tatum, Johns and Goodwin; that later in the evening they saw the police car and made a get-away through the alley; that on the afternoon of September 12, another statement was taken from Tatum, at which time Tatum changed his story by stating that he saw Johns and Goodwin wrestling with Copeland on the ground, and that at that time the men got in his car and it was then that he saw a billfold with some gasoline ration coupons; that he (the detective lieutenant) later located Goodwin and placed him in custody.

The official reporter for the preliminary examination of Floyd Tatum testified that at said examination Tatum said that he saw defendant Johns at the cafe; that Johns told him that Copeland had some gasoline stamps and that Goodwin then stated "We" or "I, will have to hit him"; that later Goodwin hit Copeland three or four times and knocked him down; that Johns reached into Copeland's pocket and took his billfold and they all got into Tatum's car and drove away.

A deputy sheriff testified that a statement was taken from defendant Goodwin to the effect that on September 11, he and Tatum entered the cafe at 8 p. m.; that Tatum left and said he would be back; that on his return Tatum said to Goodwin: "Come on, this fellow (Copeland) has a lot of gas stamps";

that Goodwin then went over to the car with Tatum; that after some discussion in the car he saw Tatum strike Copeland and then say: "Come on, I have his wallet"; that they divided the stamps among the three, drove to Johns's house, and asked if he should bring a gun but that Goodwin and Tatum advised against it; that they returned to the cafe and saw the police car and Tatum "stepped on it" and drove down the alley; that Goodwin then went to Los Angeles and was apprehended a few days later in that city. The officer then testified that Goodwin was brought back later and made another statement saying that his previous statement was true except that he, Goodwin, struck Copeland after Tatum did.

Witnesses for the defense offered considerable testimony indicating that Copeland was quite intoxicated; that he was endeavoring to dispose of gasoline stamps by sale to several other people; that he was acting disorderly in the drinking place; that defendant Johns was elsewhere on the night of September 11th between 8:30 and 10:15 p. m.; and that witnesses had heard Copeland say that he had given the "C" ration book to Johns.

James Tatum, brother of defendant Floyd Tatum, testified that he was in the cafe on September 11 and saw his brother, Johns and Copeland leave the cafe; that his brother told him he was going home to get some money; that later James returned home and saw the police car leaving; that he went to the police station and heard Copeland say that Floyd Tatum did not hit him as he was too small; that some time later Floyd gave him (James) an envelope and told him to keep it; that the envelope contained twenty-six "R" gasoline stamps and that he returned the stamps to the officer.

The defendant Tatum testified in his own behalf; that he was 18 years of age; that on September 8th he injured his hand and that on the morning of September 11th his hand was swelling up and that on that date he went to the doctor; that on the evening of September 11th he saw defendant Goodwin, took him to the cafe, and that while there Johns and Copeland came in and they all had a conversation; that Johns asked Tatum if he wanted to buy some gasoline stamps; that Goodwin and Johns called Tatum over and said: "This guy had a lot of gas stamps. . . . We ought to hit him," and that to this Goodwin responded: "I will hit him"; that the three then left the cafe, went to Tatum's house and procured $5 and returned; that while at the cafe Tatum gave Copeland $5

for the tickets; that some argument ensued and that Johns told Copeland to give Tatum his money back or the stamps; that Copeland got out of the car, walked over to his car, and that Goodwin jumped out and hit Copeland; that at that time Johns got Copeland's billfold out of the back pocket of his trousers; and that they jumped in Tatum's car and later stopped and divided the gasoline stamps among them.

If believed by the jury, the evidence, both circumstantial and direct, fully supports the verdict and judgment.

■ The next point to be considered is whether the offense of robbery is sufficiently pleaded in the information by reason of the failure to plead ownership of the property claimed to have been taken.

Defendant relies principally upon *People* v. *Cleary* (1905), 1 Cal.App. 50 [81 P. 753], where it was held that an indictment charging robbery in taking money forcibly from the person of another, which did not allege ownership of the money taken in some person other than the defendant is insufficient and entitled defendant to an arrest of judgment. Several such cases are cited in 22 California Jurisprudence, page 848, section 14. Since those decisions, sections 951, 952 and 960 of the Penal Code have been amended. (Stats. 1927, p. 1043; Stats. 1927, p. 1065; Stats. 1929, p. 303.)

In *People* v. *Summers* (1930), 107 Cal.App. 250 [290 P. 464] this question was considered. There the defendant was charged as follows: that "on or about the 17th day of April, 1929, . . . they robbed J. H. Brown, etc." The indictment was held sufficient to support the verdict of conviction on the charge of robbery under section 951, as amended in 1927. (See, also, *People* v. *Fallai* (1929), 99 Cal.App. 297 [278 P. 449]; *People* v. *Sampsell,* 104 Cal.App. 431 [286 P. 434].)

In *People* v. *Sampson,* 99 Cal.App. 306 [278 P. 492], it was held that where there was no doubt, either from the averments of the information or from the evidence, as to the identity of the property taken, and it was proved at the trial that the property belonged to the prosecuting witness, the failure of the information to allege the name of the owner of the property was immaterial under section 956 of the Penal Code.

In *People* v. *Covington,* 1 Cal.2d 316 [34 P.2d 1019], it was held that in a prosecution for robbery, there is a sufficient compliance with section 952 of the Penal Code if the statement of the offense is in the words of the enactment describing the offense or in any words sufficient to give the accused notice of

the offense of which he is accused. To the same effect is *People v. O'Neal,* 2 Cal.App.2d 551 [38 P.2d 430].

We are satisfied that the information here stated a public offense and that the evidence clearly established that the property taken was not the property of the defendant. ▮ In addition, it should be here noted that the trial court gave an instruction, at the request of the defendant, to the effect that "proof of the commission of a robbery requires proof of a voluntary intent to steal personal property. Evidence that personal property was taken from the person or immediate presence of another, without his consent, and by means of force and fear, does not necessarily, as a matter of law, prove that a robbery was committed. The evidence must show a felonious intent to steal." We cannot see how defendant can claim prejudicial error by failure to allege in the information that the property taken was the property of the complaining witness or of one other than the defendant.

▮ Defendant Johns's argument that the testimony of defendant Tatum was not corroborated is equally untenable. It has been repeatedly held that possession of stolen property may be sufficient corroboration to warrant a conviction on the testimony of an accomplice. (*People v. Rice,* 29 Cal.App.2d 614, 620 [85 P.2d 215].) The accusatory statements made to and the silence of defendant, possession of the stolen property, the testimony of the complaining witness, and circumstances above related, were sufficient to corroborate the testimony of the codefendant Tatum. (*People v. King,* 40 Cal. App.2d 137, 141 [104 P.2d 521].) ▮ The jury acquitted the codefendant Tatum. It cannot be said, as a matter of law, that he was an accomplice.

▮ Defendant's argument that the trial court refused to instruct the jury, as a matter of law, that Tatum was an accomplice, but left that question to the jury, is without merit. The jury had the right, either to believe or disbelieve his statements, and having been fully instructed as to the law governing the situation, the presumption must be that it performed its duty conscientiously in rendering the verdict, which in substance declared its belief in the truthfulness of Tatum's testimony. (*People v. Frahm,* 107 Cal.App. 253 [290 P. 678]; *People v. Howell,* 69 Cal.App. 239, 243 [230 P. 991].) ▮ A person jointly charged, is not, as a matter of law, an accomplice, where there is a dispute as to the witness's com-

plicity. (*People* v. *Truax*, 30 Cal.App. 471 [158 P. 510]; *People* v. *King*, 30 Cal.App.2d 185, 197 [85 P.2d 928].)

▇ Lastly, defendant complains because the court refused to give certain of his instructions and gave one of the People's instructions. The court gave an instruction in the language of section 1111 of the Penal Code, defining an accomplice. The given instruction complained of is but a reiteration thereof and does not incorrectly define an accomplice, to defendant's prejudice. (*People* v. *Howell*, 69 Cal.App. 239, 244 [230 P. 991].)

▇ Fifteen of defendant's refused instructions are involved in this complaint. They concern the question of the duty of the jury in weighing the evidence, the credibility of witnesses, an instruction that gasoline coupons are not property and have no value recognized by law, the necessity of showing that the money alleged to have been taken was not the property of the defendants and that it was illegal to sell gasoline coupons to defendants.

We have thoroughly examined the instructions, both given and refused. We are firmly convinced that the subject matter has been fully covered by other instructions or that they are not applicable or that they are an erroneous statement of the law as applied to the facts in the instant case. No prejudicial error appears in the instructions, given or refused, or in the entire proceedings which should result in a reversal of the judgment.

Judgment and order affirmed.

Barnard, P. J., and Marks, J., concurred.