[Crim. No. 591. Fourth Dist. Sept. 21, 1948.]

THE PEOPLE, Respondent, v. ALVIN MORGAN, Appellant.

Earl C. Broady for Appellant.

Fred N. Howser, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

MUSSELL, J.—Appellant Alvin Morgan and Robert Lee Gipson were jointly charged with the murder of one George Tomsic. Gipson was acquitted. Appellant was convicted of murder in the first degree and on the jury's recommendation sentenced to life imprisonment.

This appeal is from the judgment of conviction. The grounds of appeal stated are that the evidence is insufficient to justify the judgment; that the court erred in admitting into evidence of a statement of the accused, and, that the district attorney was guilty of prejudicial misconduct.

The deceased, an agricultural worker employed on the Barlow Farm near Arvin, in Kern County, lived alone in a small cabin on the farm. He was last seen alive on the evening of May 23d, 1947. On the morning of May 25th, a ranch foreman found him lying dead on the floor of the cabin. The evidence of dried blood and the testimony of the autopsy surgeon indicated that death had occurred on or about the 23d of May. A post mortem examination disclosed multiple skull fractures and lacerations of the head and face and that death had been caused by basal skull fractures. A tire tool or spring leaf was found under the body. A pocketbook, usually carried by decedent, was missing, and a wrench stamped with the letters "B" and "F," kept in the tool box on one of the tractors on the Barlow Farm, was also missing. This wrench was later found in a standpipe a short distance from the farm, the place of its concealment having been pointed out to the officers by appellant and his codefendant. A medical technologist found traces of blood on the wrench.

Appellant and defendant Gipson were seen together at a beer tavern near the Barlow Farm on May 23d at about 9 o'clock p.m. On Saturday, May 24th, appellant went to Bakersfield where he gave Gipson $22, and Gipson left for Tucson, Arizona. Gipson testified that while at Tucson he heard that the police were looking for him; that he went to Ogden, Utah, and from there to Arkansas where he was arrested. On May 24th, appellant returned to Arvin where he was arrested the following Monday and spent 33 days in jail in Bakersfield. On his release he returned to Arvin, remained there about three weeks and then left for Arkansas where he

was again arrested. The officers obtained a statement from Gipson at Pine Bluff, Arkansas, and a few days later took a statement from appellant in the presence of Gipson at Wichita, Kansas. Both appellant and Gipson stated they were present at and near the Tomsic cabin on the night of May 23d when deceased was beaten about the head and face, but each denied striking the fatal blows.

Appellant's testimony was that he first saw Gipson on May 23d, at about 9 o'clock p. m., at the Eagle Cafe in Arvin; that he bought Gipson some beer and then went to a show; that he got out of the show at about 11:30 and saw Gipson on his way to the Barlow Farm; that at the crossroads they parted and appellant went to David Morgan's house; that David was not at home and appellant left to stay at a neighbor's house; that when on his way he heard a noise in Tomsic's cabin like someone "scuffling" and turning his flashlight on the cabin he saw Gipson getting off Tomsic; that Gipson came over near the fence where appellant was standing and said, "Is that you, Alvin?" Appellant said, "Yes," and Gipson walked out toward the road; that he asked Gipson what was the matter and Gipson replied, "That old man hit me with this wrench and I taken it and tried to beat his brains out with it"; that Gipson threw the wrench away and then proceeded to appellant's house where Gipson cleaned himself and put on clean clothes furnished him by appellant; that Gipson took appellant's sweat shirt and wrapped the bloody clothing in it, including a pair of khaki pants belonging to appellant; that they left the house and Gipson threw the clothing into an irrigation pond; that they then went to Bakersfield where Gipson attempted to catch a bus but was unable to do so; that Gipson asked appellant for some money and appellant lent him $22 and they caught a ride back to Arvin; that he did not see Gipson thereafter until the statements were taken in Kansas.

In his statement made at Wichita, appellant stated that before they separated on the night of May 23d, near Tomsic's cabin, Gipson went out to a hay bailer and when he came back he had a wrench, which looked like a monkey wrench, and was talking to himself; that appellant said, "Robert, I wouldn't do that"; that Gipson told him he was going to have it out with Tomsic and they went to the front door of his cabin; that it was locked and they went around to the back where Gipson hit on the door and called to Tomsic to come out; that Gipson then went in on Tomsic with the wrench and "tus-

seled around in there'' and after he quit bumping around, he said, ''Come on with the light, you scarey so and so,'' and ''I just shined the light through the door that way, through the back door, and Robert was getting up from down on the floor with Tomsic when I shined the light through there, and he came out. He got up on the fence. I was standing by the fence. He stepped on my shoulder and jumped down.''

An excerpt from the statement of appellant, made at Wichita, Kansas, is as follows:

''MR. STRASNER: Morgan, we are going to point out some facts where you are lying. In the first place, you couldn't see in that door with the door shut. You said you were outside the fence, and you looked in there and saw the old man on the floor, and Robert hitting him.

''MORGAN: I said before, when the robbery was going on, I couldn't see in there. When Robert opened the door, he was getting up off the old man.

''MR. STRASNER: And you were outside the fence there?

''MORGAN: I shined the light through there.

''MR. COUGHLIN: That is about 12 or 14 feet away?

''MORGAN: Yes.

''MR. STRASNER: The reason you are lying, Alvin, is because the fence is situated so that when the door is open you can only see a small portion of that room, and that would have been in the opposite corner from where the old man was lying, and there isn't any way possible for you to see the interior of that cabin at all.

''MR. COUGHLIN: And another place: You said you opened the door and saw Robert and the old man get up. You said you opened the door and saw Robert get up off of the old man.

''MORGAN: When the door opened, that was when I saw Robert. He opened the door, and he was on his knees, getting up this way. The door was always cracked some, but I couldn't see him; and he was holding this door, getting up of his knees and opening the door at the same time.

''MR. COUGHLIN: He only has one hand to do that, you know. You realize that. Do you know, Alvin, when anyone lies they always make a mistake.

''MORGAN: That's true.

''MR. COUGHLIN: Always make a mistake, and you see, you couldn't have possibly seen into that room unless you were over there inside.

''MORGAN: O. K. This door opens from this way, and if you are standing right here when this door opens——

"MR. COUGHLIN: We tried that.

"MORGAN: You can see in the door from outside the fence when the door is opened.

"MR. COUGHLIN: Another thing, Alvin, we found a piece of iron under the old man. Robert has only one hand. He couldn't have carried a monkey wrench and a piece of iron, too.

"MORGAN: The first piece of iron, he stuck in his pocket. He kept the wrench in his hand.

"MR. COUGHLIN: That's the first time I have ever heard of anybody trying to hit somebody in the head, carrying two pieces of iron.

"MORGAN: He stuck two pieces in there. He said, 'This piece might be a little light.' He stuck it in his bosom.''

One of the officers testified that appellant told him in Pine Bluff that he didn't have anything to do with it, but that he was there at the time it happened and that it was all Robert's fault; that appellant also stated, "I am willing to take my part of the punishment, but I didn't hit the old man. Robert was the guy that done it.''

Gipson testified that he met appellant on the evening of May 23d, and that appellant asked him to go with him that night; that he was going to gamble, to get some money to get his car out. He testified that he saw appellant later that evening and that they walked down near David Morgan's house where appellant said, "Wait a minute. I have to go out here and get my rod"; that appellant went to David Morgan's car and got a tire tool, like a part of an automobile spring; that appellant gave him the tire tool and he put it inside his coveralls and carried it to Tomsic's cabin; that appellant said, "The last time I was at this guy's house gambling he acted like he wanted to start something." Gipson further stated that when they arrived at the Tomsic cabin the gate was locked; that Gipson said, "This man don't gamble"; that appellant replied, "That's what you think. Wait a minute. I'm going to jump over here and scare him." Gipson further testified that he then heard a rumbling and wrestling going on against the wall; that he climbed over the fence, opened the door and saw appellant hitting Tomsic with a wrench, similar to the wrench later found in the standpipe. Gipson stated that he "hollered" at appellant, rushed in and said, "Don't do that"; that he pushed appellant and Tomsic; that Tomsic turned on him and they both went down; that after Gipson got up appellant handed the wrench to him and they left;

that Gipson asked appellant, "What is the matter in there with you and the old man, what were you fighting for," and that appellant said he hit him. Gipson further stated that appellant told him to throw the wrench into a water pipe; that they then went to appellant's house where he saw the billfold and appellant said he had taken the old man's money; that appellant gave Gipson $22 and told him to go to Bakersfield and catch a bus and go on home, that appellant did not want him involved. He testified that appellant threw the wrench into the standpipe and also threw the billfold and bloody clothes in the pond and that they then went to Bakersfield.

■ Appellant's contention that the evidence is not sufficient to justify the judgment of conviction is based upon the theory that defendant Gipson was an accomplice and that his testimony lacked the corroboration required by section 1111 of the Penal Code. There might be some merit in this contention if we assume that there was in fact an accomplice. However, the question of whether or not Gipson was an accomplice was one of fact for the jury, and since the verdict was "not guilty" as to him, the question was determined adversely to appellant's contention. The jury was properly instructed as to the law pertaining to accomplices and as to the essential requisites of corroborating evidence. The finding of the jury cannot be disturbed on appeal.

As was said in *People* v. *Coffey*, 161 Cal. 433, 436 [119 P. 901, 39 L.R.A.N.S. 704]: "Whenever the facts themselves are in dispute, that is to say, whenever the question is whether the witness did or did not do certain things, which, admittedly, if he did them, make him an accomplice, the jury's finding, upon familiar principles, is not disturbed." (*People* v. *Dobkin*, 74 Cal.App.2d 269, 272 [168 P.2d 729].) ■ The fact that Gipson was jointly charged with appellant does not as a matter of law make him an accomplice where there was a dispute as to his complicity. (*People* v. *Johns*, 69 Cal.App.2d 737, 747 [160 P.2d 102].)

■ In addition to the testimony of Gipson, there was evidence that appellant pointed to the place where the death weapon was found, and where bloody clothes, including those of appellant, were thrown. He admitted his presence at the scene of the crime at the time it was committed.

There was evidence that appellant tried to borrow a dollar from a witness on the day of the murder and that after the killing he paid a witness $3.00 for a ride to Bakersfield. He purchased $20 worth of chips in a poker game on May 24th,

paid for them with two $10 bills and had other money in his pockets.

The inconsistencies in appellant's statements and his entire conduct furnished sufficient ground for the jury's finding.

Appellant argues that the court erred in admitting into evidence his statement taken in Wichita, Kansas. He contends that the accusatory statements then made to him were denied and that the statement should not have been admitted.

■ Where, as here, the denial was followed by the admission of special facts, the rule, that if the accused responds to the accusatory statements with a flat denial, there is no admission and nothing to be received in evidence, has no application here. (*People* v. *Simmons*, 28 Cal.2d 699, 712 [172 P.2d 18].)

In *People* v. *Brown*, 71 Cal.App.2d 669, at page 674 [163 P.2d 85], it was said: "An accusation and a denial of guilt of an alleged offense are not admissible, but a denial followed by an admission of special facts or circumstances tending to prove guilt is relevant. For instance, an accused may deny the commission of a criminal offense but subsequently acknowledge that he was at the scene of the crime."

■ Appellant's statement contained many admissions that implicated him in the commission of the crime and the fact that the statement consisted in part of accusatory questions by prosecuting officers does not preclude its admission in evidence. (*People* v. *Wade*, 71 Cal.App.2d 646, 655 [163 P.2d 59].)

■ The final contention of appellant is that the district attorney was guilty of prejudicial misconduct in his cross-examination of appellant as to the time he spent in jail. The questions and answers were as follows: "Q. When were you arrested? A. On the following Monday, the 26th. Q. Monday? A. Yes. Q. And you spent how long in jail? A. I think about thirty-three days. Q. Were you questioned at that time? A. Yes. Q. Did you tell the officers the same story you told the jury now? A. I don't remember. Q. You don't remember what you told them? A. No, sir. Q. Didn't you plead guilty to vagrancy at that time?"

Appellant testified in his direct examination that he had spent 33 days in jail after he was arrested and that he had talked to one of the officers about the killing. It was proper to question appellant on cross-examination as to the length of time he was in jail, and as to what he had stated to officers, but the last question asked was improper. ■ It is not permissible to introduce evidence of other offenses for the purpose

of creating prejudice against appellant. (*People* v. *Baylor*, 47 Cal.App.2d 34, 38 [117 P.2d 425.) ■ However, the question was not answered. The court ordered the evidence stricken out and instructed the jury to disregard any reference to any other offenses. The district attorney did not again ask the question and no further reference was made as to why appellant spent 33 days in jail. We do not feel that the conduct of the district attorney was such as to justify a reversal of the judgment. The evidence is sufficient to support the verdict of the jury.

The judgment is affirmed.

Griffin, Acting P. J., concurred.