[Crim. No. 3886.   Second Dist., Div. Three.   Aug. 30, 1945.]

THE PEOPLE, Respondent, v. KENNETH J. SHIELDS, Appellant.

Gladys Towles Root for Appellant.

Robert W. Kenny, Attorney General, and Everett W. Mattoon, Deputy Attorney General, for Respondent.

DESMOND, P. J.—The defendant was charged with the commission of four felonies: kidnapping, burglary, violation of section 288 of the Penal Code, and rape. A jury found him not guilty of rape but guilty of the three other felonies. He appeals from all the judgments of conviction on the ground

that they are contrary to the evidence and also upon claimed errors of law.

The People presented evidence tending to prove that on February 25, 1944, between the hours of twelve noon and one p. m., the defendant called at the Bellevue Apartments in Los Angeles, picked up and carried a child named Susan, a few days over three years of age, to the roof of the building and committed upon her the lewd act denounced by section 288. Several women residing in the Bellevue testified that they saw the defendant there at the time mentioned. According to a Mrs. Johnson, living on the first floor, she saw him between 12 and 12:30 p. m. as he came up Boylston Street, entered the house by himself and went upstairs. As he passed the corner of a nearby store where Susan was playing in the dirt she had seen him pat the little girl on the head. He came downstairs about eight or ten minutes later and she saw him leave the house. About ten or fifteen minutes after that she noticed defendant again as he came around the corner of the house, and this time he had Susie with him. She stated that she saw him going upstairs, carrying the little girl on his hip with her legs around his waist and her left arm around his neck; that at the time Susan was calling "Mama" in a whining or whimpering way; that defendant was saying something to the child about a tricycle or "trike"; that she heard his footsteps go up the stairs to the second floor; that about fifteen minutes later he came running down the stairs, "ran out on the porch, stopped for a moment, brushed his clothes off, ran his hand through his hair, jumped off the bottom stairs and ran north on Boylston." Mrs. Johnson further testified that about two minutes after she saw defendant running down the stairs, following his trip upward with Susie, she heard the little girl screaming, and, going out, found her on the second floor holding up her panties. A Mrs. Bass, landlady of the Bellevue, was in the room with her daughter, Mrs. Johnson, and testified that she saw the defendant "galloping" north on Boylston and noticed too that he was running his hands through his hair; that a few minutes later she saw Susie crying and holding her clothes up and that they were all soiled.

A Mrs. Mattingly testified that the defendant had occupied the apartment next to hers in the Bellevue; that she knew him by sight, and that as she was leaving the apartment house at about 12:15 p. m. on February 25th she met him coming

toward her with Susan in his arms and spoke to him, saying, "How do you do," in answer to his greeting in the same words. Her testimony was corroborated by her seven-year-old daughter, who stated that she saw the defendant going upstairs with Susie lying in his arms. A Mrs. Baker, living on the second floor of the Bellevue, testified that between twelve and one o'clock of February 25th she saw defendant as he came down the third-floor stairs around the landing, and noticed that he patted her little boy on the head. She then entered her apartment and listened to a radio program. She heard no screams.

Susan's mother testified that on February 25th the little girl and her six-year-old brother had their lunch at about twelve o'clock and then went out to play; that she next saw Susan when she came into the house crying at about 12:45 p. m.; that she picked her up and noticed she had blood in her panties; that she washed the child and examined her private parts and saw that she had been torn in the lower part of her vagina, and that the wound was still bleeding; that police officers were called and she and Susan went with them at about 2 p. m. to the Georgia Street receiving hospital and then immediately afterward to the College Hospital at Glendale. A doctor at each institution examined the child and found the hymen freshly ruptured and also a fresh laceration about one and one-half inches long in the posterior part of the vagina.

Ray Pinker, a chemist attached to the Los Angeles Police Department, testified that on the afternoon of February 25th he went to the roof of the Bellevue Apartments and determined that defendant had walked there recently, by comparing with defendant's shoes rubber-heel imprints which he found on the tar-like surface. He examined the clothing of Susan but found no seminal stains, nor did he find any upon the clothing which defendant said he wore on February 25th and which police officers took from him when they arrested him in mid-afternoon of that day. On that same day Mr. Pinker failed to find any blood upon the private parts of defendant or upon his clothing except a spot on the belt band of his shorts at the back. However, he did find scratch wounds on his neck which were still bleeding, and found blood in scrapings which he took from underneath his fingernails; also a spot of blood upon his left thumbnail and right ring finger. A smear had been taken at the receiving hospital from

the area where Susan was injured and placed upon a glass slide, which when examined by Mr. Pinker showed no spermatozoa. Defendant told the police chemist that he had had a fight earlier in the day at the place of his employment, claiming the scratches on his neck resulted from it.

Defendant testified that in the fall of 1943 he had lived for a month and a half in an apartment at the Bellevue; that several times in February of 1944 he had called there, the last occasion on February 25th; that two or three days before that he inquired of Mrs. Bass for an apartment, having in mind a penthouse on the roof; that on that day he went on the roof, "looked in the penthouse window; I had heard the people in the penthouse apartment had moved out, and I knew the people, they were friends of mine; and I started to look in the window—I thought I had better not, I didn't have any business looking in anybody's apartment; and so I walked away from the penthouse, and I stood there for several minutes thinking whether it would be advisable for me to knock on the door and get Mrs. Mack to the door. Then I thought I had better not do that, she was married and her husband was gone, and it might cause talk; and so I walked around like the heelprints indicate. . . ." According to defendant, he finished his work at a restaurant where he was employed at about 6:30 a. m. of February 25th and spent the rest of the morning until 11:45 drinking with several people there; that he had a fight with a dishwasher shortly after he stopped working. "He tried to choke me. He got me down on the floor of the barroom where he was standing; he was standing at the bar as I came through the cafe. He got me down on the floor and choked me, and as I tried to get his hands off my neck I scratched my own neck doing it."

Defendant further testified that at Mr. Pinker's office, "I showed him the handkerchief with the blood on it and asked him if he wanted that for evidence. He turned it down. The blood was mixed with mucous. He could see I had a bloody nose that morning from a fight." He stated that he left the restaurant where he had helped his companions consume three pints of whiskey about 11:40 a. m., taking with him a bottle containing what was left of the liquor, and went first to his home, six blocks from the Bellevue Apartments, and then to the Bellevue, where he knocked on the door of an acquaintance living on the third floor and receiving no answer left and did not go back at any time. He testified that he did not take

the child in his arms going into the apartment nor did he pick up Susie at that time; that the last time he was in the Bellevue was when he passed Mrs. Baker in the hall. He then described his arrest at his home by two police officers at about 3:30 p. m. of February 25th, saying that he had been asleep and was in bed wearing a T shirt; that he had not taken a bath when he returned that morning or noon and that his landlady, a Mrs. Packard, told the officers so. In this he contradicted the officer who had testified on cross-examination that defendant's landlady had said "he came home and took a bath." Defendant specifically denied having taken Susie on the roof February 25th or that he touched her with any instrument or portion of his body, or that he carried her from one portion of the county of Los Angeles to another portion against her will. Under cross-examination he stated that the dishwasher with whom he had a fight was named "Tex," and that present at the time were the bartender, Mr. Starr, "a fellow called Broadway" and a barmaid. He denied having seen Mrs. Mattingly or her daughter on February 25th. He denied that he told Officer Tetrick at the time of his arrest that he had been in bed all the morning of the 25th. The testimony of the officer on that subject had been given as follows: "A. He had no clothes on but the bedclothes over him; he was naked. Q. What did you do after you saw the defendant in bed naked? A. We made him get up and asked him where he had been that day. Q. What did he tell you? A. He said he had been out to get work in the morning and came home and went to bed and was in bed all day. Q. He said he had been in bed all morning? A. Yes, the first he told us. Q. Then after he told you he had been in bed all morning what did he do? A. We asked if he had not used to live on Boylston and he said that he had. We asked him if he had not been up there that morning and he said yes, he had."

This same officer testified that he and another policeman went with Susan's mother and the defendant to the College Hospital; that the mother entered the room where the child was in bed and shortly thereafter the defendant went into that room, being assisted in doing so by the officers; that the little girl looked at the defendant and started crying and seemed very upset; that defendant had told him that he had not harmed the child in any way and that he was not guilty

of any offense toward her. Susan's mother testified that the trip to the hospital was made probably on February 27th; that when she entered Susie's room the child was happy to see her and was singing, but that when defendant entered the room with the officer "she seemed to cower down. She was very much afraid. She looked at him and then she hid her head and started to cry"; that the defendant said nothing and did not answer when the officer asked him if he knew the little girl.

Defendant's version of what transpired at the hospital was as follows: "The doctor went in and pretty soon the other officer came out and said, 'You can bring the prisoner in now.' And so they brought me to the edge of the door, and I heard, while he was taking the handcuffs off—Mr. Tetrick was taking the handcuffs off of me—I heard Mrs. Miller inside say, 'They are going to bring in the man who hurt you and we want you to tell us if it is him'; and so he asked me right then and there, just about that time, Mr. Tetrick asked me, 'You are sure you have got nerve enough to go through with this, you dirty rat, son-of-a-bitch?' I said, 'Let's go.' He made me mad, and I said, 'Let's go'; and I started walking to the room. He let me walk in the room—he did not shove me into the room, I walked into it; and as I started to face the girl, in the middle of the room, he shoved me up against the wall. He said, 'Is this the man that hurt you?' and the little girl looked at me just blank, she didn't know what to think. Q. Don't tell what she thought. Then what happened? A. And, so, he let me stand there for about a half a minute. The child was looking at me all the time and she didn't know me; and, then, he grabbed me, and he says, 'All right, come on; get out of here.' As I was walking out I heard the mother say, 'Susie'—I looked around at that time; and she said, 'Susie, Susie, is not this the man who hurt you?' She was hysterical, and the child started to cry then; after I was already out of the room I heard her start to cry. Q. Now at that time did anybody say anything to you at all in the room? A. I don't know; I don't remember. To me? Q. Yes. A. No.''

While defendant was being cross-examined by the district attorney the following testimony was given: "Q. Mr. Shields, directing your attention again to the time when you talked to Dr. Crahan on the 31st of July, 1944, in the county jail, you

and he being present, did you not make a statement to the effect that you tried to think of whether the alleged act could have been done by you in such a state of intoxication that you did not remember doing it, but you did not believe it could have been? A. No, I did not say exactly that. He asked me here, how was it? He asked me if I had ever thought it could be me. Q. What was that? A. He asked me if I ever thought it could be me. I told him no. However, it had been suggested to me that being shell-shocked and discharged out of the Navy—that it had been suggested by Mr. Pinker, over in the Crime Laboratory, that I could have had a lapse of memory. Q. You told him it might have been done by you while you had a lapse of memory? A. No, I did not. . . . The Court: You were not discharged from the Navy because of shellshock, were you? A. Well, that was the main reason in back of it. Q. But that was not the reason you were discharged? A. No, not exactly. Q. Did you receive an honorable discharge from the Navy? A. No, I did not."

The county jail physician, Dr. Crahan, testified in rebuttal that on July 31, 1944, he had had a conversation with the accused substantially as quoted in the district attorney's question. Susan's mother, also in rebuttal, denied that she had told her little girl at the College Hospital that "they are going to bring in the man that hurt you," and stated that she did not hear either one of the officers say to Susan, while indicating the defendant, "This is the man that hurt you." She further stated that Susie began to cry before the defendant left the room. Other witnesses, produced in rebuttal, contradicted various items of testimony given by defendant; e. g., whereas he testified that he went upon the roof two or three days before February 25th, Mr. Pinker stated that when he examined him on this subject on Saturday, February 26th, the day after Susan was hurt, defendant told him that prior to the 25th he was last on the roof on the prior week end; "He thought it had been either the previous Friday or Saturday."

█ The foregoing recital has been deemed necessary for a determination of appellant's contention that the verdict or verdicts of guilty rendered by the jury were contrary to the evidence. He argues that the record fails to indicate that he was guilty of kidnapping, since it was not shown that the element of force commented upon by the court in *People* v.

*Guerrero* (1943), 22 Cal.2d 183 [137 P.2d 21], was present in the taking of the little girl upstairs in the Bellevue Apartments. He cites Mrs. Mattingly's testimony that when she saw Susie in his arms the little girl was not crying. But Mrs. Mattlingly saw them together as defendant was about to enter the building and a few seconds later Mrs. Johnson saw him ascending the stairs carrying Susie with him, at which time she was crying "Mama" in a whining or whimpering way. The jury was justified, considering the fact that the child was only a few days over three years old, in concluding that she was being taken by force and against her will. She could not by physical means resist effectively the defendant's taking her; her only recourse was to call to her mother, her natural protector.

■ Appellant's contention that the jury went contrary to the evidence when they found him guilty of first degree burglary rests upon various grounds. In considering them we must refer to the Penal Code. Section 459 provides that "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, railroad car, mine, or any underground portion thereof, with intent to commit grand or petit larceny or any felony is guilty of burglary." Count II of the information, in charging this defendant, alleged that he entered the building occupied by Mrs. Bass with the intent then and there and therein unlawfully and feloniously to commit rape and violate section 288 of the Penal Code, felonies. Apparently the argument in appellant's behalf is that since the statute characterizes as criminal an intent, on the part of the person entering, to commit in the place entered "any felony," the charge of burglary against him must fail for the reason, first, that it was alleged in the information that he intended to commit not a single felony but two, and, second, the jury found him not guilty of rape. We do not know of any process of reasoning that gives validity to such an argument. ■ The same is true of the idea advanced that the facts of the case did not support the finding of the jury because there was no "evidence to show the requisite intent in appellant . . .; the alleged victim not having testified there is no showing that her lusts, passions or sexual desires were affected one way or another." The intent requisite to sustain a conviction under section 288 is the perform-

ance of the proscribed act "with the intent of arousing, appealing to or gratifying the lust or passions or sexual desires of such person or such child." The only comment we have to make on this argument is that "such child" in this case could have been and was identified by the jury on the evidence before them as Susie (and she was barely three years old), and "such person" as appellant. It was sufficient if he had the intent to arouse his own passions. *People* v. *McCurdy* (1923), 60 Cal.App. 499 [213 P. 59], is not in point.

Section 460 of the Penal Code provides that ". . . every burglary, whether in the daytime or nighttime, committed by a person . . . who while in the commission of such burglary assaults any person, is burglary of the first degree." Counsel argues that, "The assault, if any was committed, occurred on the roof of the apartment house. . . . The house or building within the meaning of the burglary statute must be a structure with walls on all sides and covered by a roof. (*People* v. *Stickman* (1867), 34 Cal. 242.) Therefore, an assault committed upon a roof would not be an assault while in the commission of burglary, a roof not being covered by a roof and bounded by four walls." A sufficient answer to this argument lies in the statute itself. The Bellevue Apartments is a building. Moreover, it has walls on all sides and is covered by a roof. Appellant entered it. Did he at that time have the intent to commit a felony? From the fact that the jury found him guilty of violating section 288 of the Penal Code it is apparent that they also found that he had the intent to commit that crime when he entered the building. They had before them the testimony of Mrs. Johnson that when she first saw appellant on February 25th he was patting Susie's head at a nearby corner; that he then entered the Bellevue, went upstairs and after several minutes descended and left the building, only to return very shortly thereafter with Susie in his arms. Considering this and all the other testimony in the case, we cannot say that there was not sufficient basis for the jury's verdict on the burglary charge.

Our summary of the evidence in this case furnishes an adequate negative answer to appellant's complaint that his conviction of violating section 288 of the Penal Code is contrary to the evidence. The jury may have concluded from it that the child was taken by the defendant to the roof and there attacked, for there was testimony from appellant that

when he went on the roof he saw nothing to indicate that there was anybody in the penthouse at that time. In view of Mrs. Johnson's testimony that defendant made two trips upstairs within a few minutes of each other the jury may have concluded that the first was in the nature of a survey to determine the feasibility of taking the child to the roof as a secluded spot for perpetration of the crime against her.

■ Objection was made to certain testimony of the mother and the chemist which tended to show that the child had been on the roof. The circumstances testified to had some probative value and the court did not err in receiving the evidence.

Appellant claims that the court erred (1) in refusing to strike the court's own question as to "whether appellant was honorably discharged from the service" and the answer given; (2) in overruling the objections made to testimony concerning the visit to the College Hospital and the occurrences there, and (3) in not permitting cross-examination as to whether force was used in taking Susie.

■ In regard to the claim that the trial judge should have granted the request to strike out his own question as to whether appellant was dishonorably discharged from the service, it may be said that appellant brought this upon himself by the answer which he made when being cross-examined by the district attorney and which we have quoted. The judge did not ask the defendant if he had or had not been dishonorably discharged from the service. The question was: "Did you receive an honorable discharge from the Navy?" and it was a perfectly natural question, for shellshock would be a likely cause for an honorable discharge and appellant had previously volunteered the statement that "it had been suggested to me that being shell-shocked and discharged out of the Navy . . . that I could have had a lapse of memory." We do not feel that an error can justly be charged to the court in connection with this incident; rather, it was an error on the part of the appellant to use language which so easily might have misled the jury.

■ The next assignment of error is not well founded. Appellant argues that the conclusions which the prosecution expected to derive from the testimony of what occurred at the hospital "was apparently that the alleged victim was registering a complaint by her actions in the hospital room, although nothing was said at that time." In answer respon-

dent asserts: "The purpose is clearly misconceived. The only purpose at all could have been one of identification. The weight or the credibility of that, if any, were for the jury to determine." We think the latter view is the correct one, since there was no evidence that the child said a word at the meeting that could be construed as a complaint against the defendant; but, according to appellant's own testimony, Officer Tetrick asked the child, "Is this the man that hurt you?" and as appellant was walking from the room he heard her mother say, "Susie, is not this the man who hurt you?"

We have been unable to find anything in the record to substantiate appellant's final claim of error that the trial court erred "in not admitting in evidence upon cross-examination testimony as to whether there was force in the alleged kidnapping."

Since in our opinion the evidence sustains the verdict of guilty in all three counts upon which appellant was convicted, and since no prejudicial error appears, the judgments are each and all affirmed; so also is the order denying his motion for a new trial.

Shinn, J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 27, 1945.