[Crim. No. 3902.   In Bank.—February 17, 1936.]

THE PEOPLE, Respondent, v. THOMAS EDWARD DUG-GER, Appellant.

No appearance for Appellant.

U. S. Webb, Attorney-General, and Warner I. Praul, Deputy Attorney-General, for Respondent.

WASTE, C. J.—In an indictment returned by the grand jury of Los Angeles County containing eleven counts, the defendant was charged with assault with intent to commit robbery, assault by means of force likely to produce great bodily harm (in three separate counts), mayhem, robbery, rape, attempted rape, burglary and kidnaping for the purpose of robbery. A count charging violation of section 288a of the Penal Code was dismissed upon request of the district attorney. To these several counts the defendant entered pleas of not guilty and not guilty by reason of insanity. At the conclusion of the trial upon the general issue, the jury returned verdicts finding defendant guilty as charged in each count of the indictment and, under the provisions of section 209 of the Penal Code, fixed the penalty at death upon the charge of kidnaping. On the trial of the sanity issue, the jury found that defendant was sane upon the occasion of the commission of each of the several offenses. Though notice of appeal was regularly given, counsel who represented defendant upon the trial has declined to argue the cause orally before this court or to file a brief herein. The cause therefore stands submitted on the transcript of the proceedings had in the court below and a digest of such proceedings filed by the attorney-general.

We have carefully examined the entire record, including the evidence, and have found nothing therein that would warrant this court's interfering with the judgment of the court below imposing the extreme penalty in conformity with the verdict of the jury. The evidence is ample to sustain defendant's conviction of the several offenses charged in the indictment. Three women testified upon the trial that they

were the victims of defendant's brutal and fiendish assaults. One testified that while walking along the street at night she was set upon by the defendant and beaten about the face and body until she fell to the ground. As a result of this unprovoked attack the witness lost the sight of one eye. The second woman, a clergyman's wife, testified that after she had given food to the defendant in her home and was about to furnish him with carfare, in response to his request therefor, he snatched her purse from her hands, felled her with a blow to the face and following additional blows upon her body succeeded in having sexual intercourse with her against her will. The defendant previously had done some gardening for the husband of the victim. This attack occurred approximately two hours after the attack on the first woman. As a result thereof the witness lost two teeth and suffered numerous cuts and bruises which necessitated hospitalization for about seventeen days.

The third victim testified that after defendant had obtained entrance to her home at night by stealth and without her knowledge, he had subjected her to a brutal beating, telling her he wanted money and love; that when she was helpless from the blows rained upon her the defendant dragged her from one portion of the house to another against her will and then attempted to have intercourse with her. Failing in this, he ransacked certain dresser drawers and ultimately departed. Nine days intervened between the former two attacks and this one. The last victim suffered the loss of six teeth, sustained three fractured ribs and received numerous bruises and contusions necessitating her confinement in a hospital for approximately twelve days.

The prosecution read into evidence a full and complete confession made by defendant to the police. His testimony before the grand jury was also introduced. Upon each of these occasions the defendant admitted the commission of the three attacks substantially as above outlined. Other evidence was also adduced by the prosecution. The defendant offered no evidence on the trial of the general issue.

■ As above stated, the evidence fully supports the several verdicts of the jury. Section 209 of the Penal Code, as amended in 1933, and as construed and upheld in *People* v. *Tanner,* 3 Cal. (2d) 279 [44 Pac. (2d) 324], warrants the

imposition of the extreme penalty. At least as to one of the victims, the evidence points to the commission of the crime of kidnaping for purpose of robbery, as the same is defined in the cited code section, and the victim thereof having suffered bodily harm the jury was well within its province in fixing the penalty at death.

Defendant's entire defense was addressed to the sanity issue. In this connection, he called several lay witnesses for whom he had formerly worked. Some testified that they had found him to be gentle and intelligent. Others testified that they had heard him talking to himself and had seen him in semi-public places with his person exposed. Others stated that he was a nervous type and that he lacked continuity of thought. The defendant took the stand in his own behalf and admitted the assaults on his three victims. In each instance he stated that the motivating force was robbery. His testimony corroborates that of his victims. He also testified that on many occasions prior to the commission of the offenses above described, he had seen visions and had suffered from hallucinations and that while serving in the army in Panama he had been temporarily incarcerated in an asylum. We pause to state, however, that at no time had he ever been judicially declared insane. He admitted a long history of self-abuse, venereal disease and depravity. His testimony at times was incoherent and rambling. On cross-examination he definitely stated that at the time of perpetration he was aware of the wrongful character of the acts for which he stands convicted. A doctor called by defendant, who had specialized in nervous and mental diseases, testified that defendant was a psychopath, a sexual pervert, a sadist and a mental defective but that he gave "no evidence of being legally insane". He further described defendant as a high-grade moron who occasionally becomes emotionally unstable but at the same time understands the nature and consequences of his acts. Defendant was finally characterized by the witness as one hundred per cent degenerate. In substance, this was the extent of the defense offered.

Three other doctors specializing in nervous and mental diseases were appointed by the court to examine the defendant. One of these witnesses testified that in his opinion the defendant was insane at the times of the commission of the of-

fenses and at the time of trial. He based his conclusion on the history of the case, on defendant's statements that he suffered from hallucinations and upon the fact that formerly defendant had been confined in an asylum. The second doctor was the superintendent of the Norwalk State Hospital for the insane. He testified that he had examined the defendant mentally and physically and had gone over his entire history and concluded therefrom that the defendant was sane when the offenses were perpetrated and at the time of trial and that defendant was aware of the nature and wrongful character of his acts.

The third doctor appointed by the court testified, after examining defendant, that in his opinion the defendant was legally and medically sane and understood not only the na-. ture and character of his acts but the difference between right and wrong. He described defendant as a ''constitutional psychopath, who is undoubtedly hyper-sexed, and who . . . did things he knew were wrong, but did them under impulse to some extent''.

The evidence is ample to support the finding of the jury that defendant was sane when the offenses were committed. In *People* v. *Keaton,* 211 Cal. 722, 724 [296 Pac. 609], it is declared that ''Responsibility depends upon whether the defendant knew the nature and quality of the act at the time of its commission, and the wrongfulness of the act. If he had sufficient mental capacity to know what he was doing, and to know that it was wrong, he is legally accountable for his act. Even though he may be mentally abnormal or defective, or may suffer from some nervous disorder, he is, under our law, held to full responsibility for his act unless the evidence brings him within the strict legal meaning of insanity.'' The question of the weight and credibility to be given to the testimony of the several witnesses was within the exclusive province of the jury.

We find nothing in the rulings of the court on the evidence or in its instructions to the jury that approximates prejudicial error.

The judgments and orders are, and each is, affirmed.

Curtis, J., Shenk, J., Thompson, J., and Seawell, J., concurred.