[Crim. No. 5118. In Bank. Dec. 12, 1950.]

THE PEOPLE, Respondent, v. LOUIS FRANKLIN SMITH et al., Appellants.

Kennedy Jackson, under appointment by the Supreme Court, for Appellants.

Fred N. Howser, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

GIBSON, C. J.—Defendants Smith and Allen, inmates of Folsom prison, were charged with having assaulted Willard Borton, another inmate, in violation of Penal Code section 4500, which makes it a crime punishable with death for a person undergoing a life sentence to assault another with a deadly weapon. In a second count, defendants were charged with having murdered Borton. They were convicted on both counts and were separately sentenced to suffer the death penalty for each offense. The appeal is automatic under section 1239(b) of the Penal Code.

At the time Borton was killed, Smith was serving a life sentence for first degree murder. Allen was then serving an indeterminate sentence of from five years to life for burglary, and the length of his sentence had not yet been fixed by the Adult Authority. It is settled that section 4500 is applicable to a prisoner serving such a sentence until there is a remission of part of the life term. (*In re Wells,* 35 Cal.2d 889 [221 P.2d 947] ; *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53].)

Charles Biersdorff, another prisoner, testified that on the morning of October 11, 1949, he heard someone shout, "Help, they're killing me," and looking in a window of the prison barbershop he saw defendants attacking Borton. He said that Allen hit Borton on the head several times with a hatchet, knocking him down, and that while Allen was striking Borton

with a hatchet Smith was stabbing him with a knife. Borton fell to the floor, and Smith got down on his knees and drove the knife into Borton's back and then put all his weight on the knife to push it in farther. Biersdorff backed away from the window and saw defendants leave the barbershop and go to an area where there were facilities for washing. Borton staggered out of the barbershop.

A prison guard saw Borton fall to the ground with a knife sticking in his back. He died in the prison hospital a few minutes later. In addition to the knife wound in his back there were five knife wounds in his chest, two wounds on his head caused by a blunt instrument, several ragged lacerations toward the back of his head and slashes and cuts on his forearms. The chief medical officer testified that death was caused by the wounds and resulting loss of blood.

When defendants were examined by prison officers shortly after the assault was committed, there was a blood spot on Smith's arm, Allen had a fresh cut on his hand, and both of them had blood on their clothing. A hatchet with blood on it was found in the barbershop, and a search revealed that a leg was missing from a low table in Smith's cell. A criminologist testified that in his opinion the hatchet handle was made from the missing leg. He based his conclusion on similarities between the handle and the table legs as to length, paint layering and arrangement of mortices. The hatchet handle and the handle of the knife found in Borton's back were wrapped with the same kind of tape, and the torn ends matched, that is, the outside end of the tape applied to the hatchet handle matched the inside end of the tape applied to the knife.

After defendants had been examined by prison officers they were placed in separate cells, and Sergeant Katsulis, of the prison staff, took a concealed position and listened to conversations between them. Katsulis testified that Smith said, "We knew what we were getting into, didn't we Johnnie?" Allen replied, "That is right." Smith said, "Any regrets, Johnnie?" Allen answered, "Hell, no." In another conversation Smith told Allen that he had been questioned about the hatchet, and he asked Allen, "How do you suppose he [the warden] tied me in with the hand-axe, Johnnie?" Allen said he didn't know. Smith then stated, "Maybe they found that table in my cell that I made the handle out of and the tape I wrapped the handle with. Johnnie, that is about it."

Defendants took the stand in their own behalf and denied that they killed or assaulted Borton or that they were present

during the attack. They also denied that they had anything to do with the manufacture of the hatchet handle or that they made the statements attributed to them by Katsulis.

The evidence is clearly sufficient to support the conviction of defendants on both counts, and they base their claim for reversal of the judgments upon asserted errors in admitting evidence, in instructing the jury and in denying their motions for a new trial.

It is first contended that the court erred in admitting testimony over the objection that no proper foundation had been laid. James C. Dunn, a stenographic reporter called as a witness by the prosecution, was asked to read excerpts from his notes of a conversation between defendants which he overheard while they were confined in their cells after the assault. The evidence was offered for the purpose of rebutting testimony given by defendants. After the witness had been questioned on *voir dire* examination as to how he recognized the voices he heard as being those of defendants, objection was made to the introduction of his testimony because it was asserted his identification of the voices was based on information given him by prison officers that defendants were occupying the cells where the persons speaking were confined.

The record shows, however, that a short time before Dunn overheard the conversation in question he was present while defendants were being examined in the warden's office, and he testified that he heard defendants talk on that occasion and that he recognized their voices when he heard the conversation which he recorded. A sufficient foundation was laid, and the evidence was properly admitted. Defendants also objected to the testimony of Dunn, who acted as a court reporter during the trial, upon the ground that he had not been excluded from the courtroom as had other witnesses. In overruling the objection the trial court pointed out that since Dunn's testimony consisted entirely of reading notes previously recorded, there was no reason for excluding him from the courtroom. This matter was within the discretion of the trial court, and defendants have not shown they were prejudiced in any way by the ruling.

Defendants next contend that the court erred in instructing the jury that they could be convicted or acquitted upon either or both of the charges, i. e., assault by a life term convict and murder. They argue that there can be but one conviction where the offenses arise out of the same act, and in support of their position they cite section 654 of the Penal

Code which provides that "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ." We do not agree that the jury was erroneously instructed. The prohibition contained in section 654 must not be confused with the doctrine of included offenses which is part of the constitutional guarantee against double jeopardy. As pointed out in *People* v. *Kehoe,* 33 Cal.2d 711, 713 [204 P.2d 321], "This section is not concerned with the question of whether the particular crime, in the abstract, necessarily and always is included within another one, but rather, it is directed to the question of whether two statutes punish one specific act of the defendant." ■ Defendants properly concede that the offenses of assault by a life term convict and murder are not "necessarily included offenses" within the meaning of section 1023 of the Penal Code which implements the constitutional guarantee against double jeopardy by providing that a prior conviction is a bar to subsequent prosecution for the same offenses "or an offense necessarily and at all times included therein." (See *People* v. *Greer,* 30 Cal.2d 589, 596-604 [184 P.2d 512]; *People* v. *Kehoe,* 33 Cal.2d 711, 713 [204 P.2d 321]; *People* v. *Knowles,* 35 Cal.2d 175, 186 [217 P.2d 1].)

■ Section 654 prohibits double punishment for the commission of a single act (*People* v. *Kehoe,* 33 Cal.2d 711, 713 [204 P.2d 321]; *People* v. *Knowles,* 35 Cal.2d 175, 187 [217 P.2d 1]), but it does not prohibit convictions for different offenses arising out of a single act unless one is necessarily included within the other. (Pen. Code, §§ 954, 1023; *People* v. *Craig,* 17 Cal.2d 453, 457 [110 P.2d 403]; *People* v. *Kynette,* 15 Cal.2d 731, 761-762 [104 P.2d 794].) To preclude any possibility of the dual judgments working any disadvantage to the detriment of the defendant in the later fixing of his term, the judgment of conviction of the lesser crime has been reversed in several cases. (*People* v. *Knowles,* 35 Cal.2d 175 [217 P.2d 1]; *People* v. *Kehoe,* 33 Cal.2d 711 [204 P.2d 321]; *People* v. *Clemett,* 208 Cal. 142 [280 P. 681].) In the present case, since there can be but one execution of the death sentence for the violation of Penal Code section 4500 or for first degree murder, no purpose would be served by reversing either judgment to avoid any possibility of double punishment.

■ Defendants moved for a new trial upon the ground of newly discovered evidence, and in support of their motion presented an affidavit by the witness Biersdorff stating that

he was promised by prison officials that if he would testify in the case he "could forget about the rest of [his] time," and that he "would be well protected." He declared "I testified as I did through the promises that were made to me," and he complained that these promises were not kept. He also averred that he was shown photographs of defendants by the deputy district attorney, that he was told by the warden "them are the men," and that "without the coaching I could not have positively identified Allen and Smith." Biersdorff did not state, however, that on retrial he would retract any of his testimony, or that he did in fact testify falsely, or that any officer suggested to him that he tell anything about the case that was not the truth. Although the statements made by Biersdorff, if believed, would affect his credibility as a witness and the weight to be given his testimony, it was the duty of the trial court to test those statements in the light of the testimony of the witness and the other evidence in the case. Biersdorff was subjected to lengthy cross-examination covering every detail of his testimony, and his identification of defendants was amply corroborated by other evidence. Applications for a new trial based on newly discovered evidence are addressed to the discretion of the trial court, and its determination will not be disturbed in the absence of a clear showing of abuse of discretion. No such showing appears here.

The judgments and the orders denying motions for a new trial are affirmed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.