[Crim. No. 5006. In Bank. Dec. 18, 1951.]

THE PEOPLE, Respondent, v. CARYL CHESSMAN, Appellant.

170

Caryl Chessman, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, Frank Richards, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), Jere J. Sullivan, Robert Wheeler and J. Miller Leavy, Deputy District Attorneys, for Respondent.

SCHAUER, J.—Defendant appeals from judgments of conviction of 17 felonies, rendered pursuant to jury verdicts, and from an order denying his motion for new trial. For convenience of discussion the crimes are listed in chronological order and numbered. Each paragraph indicates a separate general criminal enterprise, in each of which one or more offenses were committed.

January 3, 1948: (1) First degree robbery of McCullough.

January 13, 1948: (2) Grand theft of an automobile, which was used in perpetrating subsequent crimes and in

which defendant was fleeing when he was apprehended.

January 18, 1948: (3) First degree robbery of Bartle. January 18, 1948: (4) First degree robbery of Ballew. January 19, 1948: (5) First degree robbery of Lea. (6) First degree robbery of Regina. (7) Kidnaping Regina for the purpose of robbery, with infliction of bodily harm; punishment fixed at death. (8) Violation of section 288a of the Penal Code, committed against Regina.

January 20, 1948: (9) First degree robbery of Stone.

January 22, 1948: (10) Attempted robbery of Hurlburt. (11) Kidnaping Mary for the purpose of robbery, with infliction of bodily harm; punishment fixed at death. (12) Attempted rape of Mary. (13) Violation of section 288a of the Penal Code committed against Mary.

January 23, 1948: (14) First degree robbery of Waisler. (15) First degree robbery of Lesher. (16) Kidnaping Waisler for the purpose of robbery, with infliction of bodily harm; punishment fixed at life imprisonment without possibility of parole. (17) Kidnaping Lesher for the purpose of robbery.

The jury further found that defendant was armed at the time of the commission of each of the crimes except that of grand theft, numbered (2) above; that he was armed at the time of his arrest; and that he had suffered two previous convictions of robbery and one of assault with a deadly weapon. Defendant was acquitted of one count of burglary. We have concluded that no prejudicial error is shown and that the judgments and order should be affirmed.

### Sufficiency of Transcript

Defendant argues questions as to the correctness and validity of the reporter's transcript which were finally decided against him by this court in *People* v. *Chessman* (1950), 35 Cal.2d 455 [218 P.2d 769, 19 A.L.R.2d 1084]. Reexamination of these arguments and of the transcript leaves us convinced that the transcript permits a fair consideration and disposition of the appeal.

### Denial of Continuance to Enable Defendant to Obtain Counsel, or to Interview and Subpena Witnesses and Prepare His Case in Propria Persona

Defendant complains that he was forced to go to trial unprepared. The situation on which this claim is based resulted from the fact that he insisted upon representing himself. The informations against defendant (numbered 117963 and

117964) were filed on February 18, 1948. On February 20, 1948, defendant, represented by private counsel Morris Lavine, was arraigned and the causes were continued to February 27. On February 27 amended informations were filed and the causes continued to March 5. On March 5, defendant, represented by private counsel V. L. Ferguson, appeared and was arraigned on amended informations; time to plead was continued to March 9. On March 9 defendant and Mr. Ferguson appeared and Mr. Ferguson was relieved as counsel. Defendant now asserts: "one of those counsel wanted more money than appellant believed his services were worth and appellant and his father could not agree with the other counsel as to the conduct of the defense, so both were relieved and appellant determined to represent himself."

On March 12, 1948, defendant appeared without counsel. The public defender was present and announced, "We have been relieved, your Honor." Defendant stated that he wished to represent himself. After a colloquy with the court during which defendant repeated his insistence on representing himself, the court said, "What will probably happen, if we set this case down for trial, you will want a lawyer and then ask for a continuance. If you want to try your own case, there is no way we can tell you not to. You will have to try it or have somebody hired to represent you in plenty of time to try the case at the time it is set. THE DEFENDANT CHESSMAN: I understand that. THE COURT: Because many times men with past experiences such as you have had—you know the tricks of the trade, and they get a lawyer at the very last minute. You really want to try your own case? THE DEFENDANT CHESSMAN: That is correct." Defendant pleaded not guilty; the court set April 26 and 29 as the dates for trial on the respective informations and again explained to defendant that no continuance based on his decision to represent himself would be granted. "Some time during the middle of March" Mr. Al Matthews, deputy public defender, called on defendant at the county jail and offered his services; defendant refused them. On April 26 all charges against defendant were continued to April 29 for trial. On April 29 defendant appeared without counsel, moved for another continuance, and complained that because of his confinement in the county jail he had been unable to obtain lawbooks and interview witnesses. The trial court explained to him that his decision to represent himself did not entitle him to greater privileges than other prisoners; defendant again re-

peatedly refused the offer of counsel; and a continuance was denied.

Defendant summarizes the trial court's position as follows: "That the calendar judge in assigning the case for trial had warned the defendant that he must be ready and that he would be allowed no continuance. That the trial court offered to appoint counsel who could have prepared a defense for the defendant. That because the defendant refused the appointment of counsel it was the defendant's own fault that he was not prepared, that he could not consequently complain of his lack of preparation, that the sheriff's regulations [of the privileges accorded prisoners in the county jail] could not be interfered with by the court, and that, therefore, the defendant must go to trial, prepared or not." This is a fair summary of the court's position; that position appears correct; and defendant cites no authority to the contrary.

■ Defendant argues that the denial of a continuance deprived him of the right to select counsel of his choice and deprived such counsel of the opportunity to prepare. The answer to this contention is factual and appears from the above summarized history of the proceedings prior to trial. Defendant was entitled to waive assistance of counsel, and it is clear that he did so of his own volition and with full knowledge of what he was doing (*Adams* v. *United States ex rel. McCann* (1942), 317 U.S. 269, 279 [63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435]; *cf. People* v. *Chesser* (1947), 29 Cal.2d 815, 822 [178 P.2d 761]).

■ Furthermore, defendant did not go to trial without the services of an attorney at law. Immediately before the jury were impaneled, defendant announced to the court that he intended to accept the services of Mr. Matthews as legal adviser (not counsel) and throughout the trial Mr. Matthews was present and his legal ability and experience were available to defendant. These circumstances will be material to our disposition of certain contentions of defendant hereinafter discussed, and it will be necessary for us to refer again to the following proposition: A defendant who intelligently refuses counsel and insists upon personally conducting and controlling his defense does not lose the status of prisoner and become entitled to extraordinary privileges not accorded defendants who are represented by counsel, nor does he become entitled to proceed in a manner different from that permitted to attorneys.

## Consolidation of Counts

■ Defendant contends that the trial court erred to his prejudice by consolidating for trial the crimes charged in Information 117963 with the crimes charged in Information 117964. This type of objection cannot be urged for the first time on appeal. (*People* v. *Pearson* (1940), 41 Cal.App.2d 614, 619 [107 P.2d 463]; *People* v. *Johns* (1945), 69 Cal.App. 2d 737, 740 [160 P.2d 102]; *People* v. *Beck* (1945), 71 Cal.App. 2d 637, 641 [163 P.2d 41].)

Defendant asserts that he objected to the consolidation in the trial court but the record[1] shows that he did not. Originally the case of Information 117963, by which defendant and David Knowles were jointly charged with crimes described in *People* v. *Knowles* (1950), 35 Cal.2d 175 [217 P.2d 1] (grand theft of an automobile, above numbered (2), and two robberies and two kidnapings, above numbered (14) through (17) ), was set for trial on April 26, 1948; the case of Information 117964, which charged defendant alone with the remaining crimes of which he has been convicted, was set for trial on April 29. When the first group of charges came on for trial defendant's motions for a trial separate from that of Knowles and a continuance were granted. All charges against defendant came on for trial on April 29. At this time the court ordered the cases against defendant consolidated for trial. Defendant asked "that these cases be returned to the Master Calendar court for reassignment" and stated at length his reasons for this request, but he did not suggest that the cases should not have been consolidated.

## Motion for Change of Venue

Immediately before the jury were impaneled, Mr. Matthews stated to the court that defendant wished to move for change of venue, on grounds unknown to Matthews, and that he could have the application prepared later in the day. The trial court told defendant to state orally the grounds on which he sought change of venue. Defendant stated that he could not obtain a fair trial in the county because a prejudicial article about him had appeared in a local publication, and because the district attorney planned to prosecute another person for crimes which were similar to some of those charged

---

[1]The pertinent portion of the transcript was prepared by the original reporter and defendant does not challenge its accuracy.

against defendant and which had been committed at times when defendant was in prison. The court ruled, "The motion will be denied."

■ Defendant complains that he was not given opportunity to present a written, verified application as required by section 1034 of the Penal Code. There is no indication that the denial of the motion was on the ground that it was not in proper form. Defendant had had ample time to prepare a proper application, and the motion came too late and should have been denied even if it had been in writing. Furthermore, the trial court was well within its discretion in denying the motion on the merits.

### Requirement That Defendant Remain at Counsel Table

■ During voir dire examination of the prospective jurors defendant was not allowed to approach the jury box and during the trial he was not allowed to approach witnesses on the stand. Defendant urges that he was hampered in the presentation of his case and unfairly discriminated against, since the prosecuting attorney moved about the courtroom and dramatically approached witnesses and jury, whereas defendant, in violation of section 688 of the Penal Code, was subjected to "more restraint than . . . [was] necessary for his detention to answer the charge." The trial court's ruling was within its discretion. Defendant, whether or not he was guilty of the crimes charged in this proceeding, was a defendant on trial for these charges. In representing himself he retained this status and did not attain that of an attorney at law who is an officer of the court and responsible to it. Furthermore, the defendant had suffered previous convictions of crimes of violence. Neither the presumption of innocence as a rule of proof in relation to the crimes charged nor the elements of a fair trial under due process required the court to conduct the trial proceedings oblivious to the facts mentioned. Considerations for the safety and security of all persons present in the courtroom, including the defendant, and for the judicial process itself, justified the trial judge in feeling that it was unwise to allow defendant to wander freely about the courtroom.

### Denial of Defendant's Motion for Daily Transcript

■ Although the trial judge knew that the trial would be long, the factual issues numerous, and the death penalty would be sought, he denied defendant's motion for a daily

transcript. The prosecuting attorney did not request or receive a daily transcript but he did obtain, apparently without court order, transcription of certain portions of the trial which he used in his argument to the jury. The reason for this seeming discrimination does not appear. But neither does it appear that defendant was prejudicially handicapped by want of a daily transcript. He presented his case and delivered his argument without any indication of confusion or uncertainty; accordingly, no miscarriage of justice on this account is established. (Cal. Const., art. VI, § 4½.)

### Misconduct of Prosecuting Attorney Not Controlled by the Trial Court

 Regrettably, the prosecuting attorney presented his case in an overzealous manner, both in addressing the jury[2] and in improperly bringing in evidence of misconduct of defendant for which he was not on trial.[3] But the improprieties of the prosecuting attorney could have been corrected had there been objection thereto in the trial court. Defendant now complains that the trial court of its own motion should have interposed objections and, in effect, undertaken defend-

---

[2] The prosecuting attorney on voir dire examination of the prospective jurors said, "I do not believe the evidence will show that the defendant has murdered or killed anyone yet." On the voir dire examination and in argument he emphasized his belief that defendant should receive the death penalty. He commented that defendant was representing himself in order to gain the sympathy of the jury.

The prosecuting attorney in argument was summarizing evidence of one of the robberies when a juror asked, "Isn't that grand theft when it is over $500?" He replied, "It is true, Mrs. Vamos, that I could from the penal code give you at least a half dozen particular crimes that I know he has committed that he is not charged with here. . . . You are correct. It is grand theft, because the amount taken was over $500. But robbery is a different character of crime than grand theft, although we could charge him, we just didn't do it. . . . It is a violation of the deadly weapons act for . . . a man who has been previously convicted of a felony, to . . . have in their possession this gun. He is not charged with it. It is just one of the other things. I can think of some other crimes which he has committed such as assault with a deadly weapon. We did not charge it. I would have to stop some place or we would be talking here all day. I do not want to do that. Don't let those things bother you too much."

[3] Officer Forbes, who gave proper evidence of admissions and confessions made by defendant, was also permitted, without objection, to testify to statements of defendant which disclosed what defendant now aptly characterizes as his "self-admitted violent criminal past and present dangerous, antisocial state of mind." These later statements were introduced by the prosecution under the guise of impeaching defendant's testimony as to the context of his conversations with Forbes.

ant's representation. But defendant deliberately (and not naively) determined to represent himself; part of the technique of his representation appears to have been the studied omission to interpose objections, the frank admission that he was a criminal, and the argument that the crimes charged were committed by a blundering person rather than a clever professional such as the evidence indicates he was; he followed this technique while requiring a skilled defense attorney to sit silently at his side. We are not disposed to permit a defendant who thus develops a record to claim prejudice from it, although the cumulative instances of misconduct might in other circumstances constitute ground for reversal. It is because of defendant's purposeful and informed failure to have this case tried in a different fashion that such cases as *People* v. *Orcalles* (1948), 32 Cal.2d 562, 572 [197 P.2d 26]; *People* v. *Hardy* (1948), 33 Cal.2d 52, 62 [198 P.2d 865]; and *People* v. *Lynch* (1943), 60 Cal.App. 2d 133, 143 [140 P.2d 418], are not controlling here.

### Admissibility of Confessions

Defendant urges that the admission in evidence of assertedly coerced confessions was not merely error but deprived him of due process. The evidence as to the circumstances under which the confessions were obtained was in conflict as to whether defendant was beaten by the police but, defendant urges, there is sufficient uncontradicted evidence to overcome, as a matter of law, the People's prima facie showing that the confessions were voluntary. The evidence in this respect is as follows:

On Friday evening, January 23, 1948, police officers in a patrol car observed an automobile which corresponded to the description of the one which had been used in certain of the crimes here charged. When the officers turned on their red spotlight the car, which was driven by defendant, fled. There was a lengthy chase, first in the automobiles, then on foot. Defendant was captured and handcuffed after a struggle. He was taken to the Hollywood police station and held there until Monday evening, January 26, 1948, when he was taken to the Los Angeles county jail.

On the night of January 23 defendant was questioned by police officers from about 8:30 to 10:30. On the morning of January 24 Officer Forbes commenced to question defendant at about 8 o'clock. Defendant first denied participation in any of the crimes here concerned. Forbes told defend-

ant, "you can't beat us on this particular job" (the crimes committed with Knowles), and pointed out that defendant had been driving a stolen car which contained loot from those crimes; defendant then confessed those crimes. Forbes and other officers continued the interrogation, particularly concerning the sex crimes. The officers testified that they made no promise of reward or inducement. Defendant asserts that he confessed to the sex crimes only after the officers said they would charge him solely with robbery.

On January 24 defendant was taken to the home of a victim of some of the crimes. She identified him. Defendant testified that during this trip the officers' conduct made it clear to him that they hoped he would attempt to escape. That this conduct was for the purpose of putting defendant in fear, he argues, is shown by the testimony of one of the officers who accompanied defendant that he had another officer "tail us in case anything happened in our car."

The asserted confessions of the sex crimes were made on the afternoon of January 24, after defendant had talked to a police psychiatrist with whom he refused to discuss such crimes. Defendant argues that it is inherently improbable that he would refuse to discuss the matter with the psychiatrist and would shortly thereafter voluntarily confess the crimes to the police.

Officer Forbes, one of the officers who questioned defendant, testified that a bulletin to the effect that defendant had confessed to the sex crimes was sent on the police teletype at 9:15 a. m. on January 24, although defendant did not confess until after 3 o'clock of that afternoon. This premature release of the bulletin (assuming Officer Forbes' statement of the time of release to be correct), says defendant, shows that the officer anticipated that, although a voluntary confession was not forthcoming, a confession would in some manner be obtained.

Officer Forbes testified that it was usual police practice to have a defendant who admitted his guilt sign a written confession but that he did not request defendant to do so because "I thought it would be useless" and that he made no written notes while talking with defendant because "Some suspects will relate it and let you write it down as you take it; other suspects wouldn't tell you anything if they know you are taking notes." Yet another police officer who, with Forbes, questioned defendant testified that he made a list of crimes

(not the crimes charged here) to which defendant confessed and that he wrote the list in defendant's and Forbes' presence after defendant said, "Get your pencil and paper." This contrasting testimony, says defendant, shows that his confessions to the crimes charged were not free.

Further showing that his mentality was not free when he confessed, says defendant, is Forbes' testimony that "[W]hen we were thumbing through the crime sheets, anything that we thought might fit the description of Chessman, he would say, '. . . If you want to clear your books just mark them off. I'll take credit for them.'"

■ The above recited arguments of defendant as to the asserted involuntariness of his confessions relate to conflicting inferences of fact which could be drawn from the testimony. Those inferences were tentatively drawn against defendant by the trial judge when he admitted the confessions in evidence and, presumptively, were finally drawn against defendant by the jury in the light of all the evidence. This is not a case where the confessions are shown, on the face of the record, to have been given in circumstances inherently coercive.

### Instructions as to False Confession

■ The jury were instructed that "If under my instructions you find that a voluntary confession was made, you are the exclusive judges as to whether or not the confession was true; and in deciding that question you should consider all the circumstances connected with the making of the statement, as shown by the evidence. *But even if you should find that a confession was false, either entirely or in part, it remains, nevertheless evidence for your consideration, to be given such significance as your judgment may determine under instructions that I shortly shall give concerning false statements made by a person accused of crime.*" (Italics added.) The italicized portion of this instruction was held ground for reversal in *People* v. *Ford* (1948), 89 Cal.App.2d 467, 473 [200 P.2d 867], on the ground that "If the jury had believed that defendant lied to the officers when he admitted the theft, he should have been acquitted. How they could have started with the premise that he was innocent and ended with a conclusion that he was guilty because he had lied to the officers is something we are unable to comprehend. But if this could not have been done the instruction was confusing and impossible of rational application to the evidence." In the Ford case, however, "there was only slight circumstantial

evidence of defendant's guilt aside from the confession'' (p. 471 of 89 Cal.App. 2d) and the trial court gave no explanatory instructions concerning false statements by one accused of crime. Here there is ample evidence of guilt apart from the confessions; the declarations of the defendant in making the confessions may have been in part true and in part false; the statements assertedly made by defendant, as related above, were to some extent self-contradictory; and the following instruction correctly explaining the possible evidentiary value or immateriality of false statements was given: ''If you should find from the evidence that there was an occasion when the defendant, under conditions which fairly afforded him an opportunity to reply, . . . made false, evasive or contradictory statements, in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature, . . . his . . . conduct may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only to explain the conduct of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement.'' (See, also, *People* v. *Woods* (1950), 35 Cal.2d 504, 510 [218 P.2d 981], and *People* v. *Liss* (1950), 35 Cal.2d 570, 574 [219 P.2d 789], pointing out the dangers of an instruction such as the italicized portion of the instruction quoted on p. 180, *supra,* but holding such instruction not reversible error in the circumstances.)

*Contention that the Instructions Took From the Jury the Question Whether a Confession Was in Fact Made*

 Defendant contends that the instructions assume that defendant in fact confessed. The instruction quoted *supra,* p. 180, commences, ''If under my instructions you find that a voluntary confession was made . . . ,'' and the jury elsewhere were told that they ''must disregard the asserted confession entirely unless you . . . conclude that the alleged confession not only was made, but was voluntary.'' Thus it was made clear to the jury that the question whether a confession was made, as well as its character as voluntary or involuntary, if made at all, was for them to determine.

*Omission to Instruct that Jury Should Consider Defendant's Mental Condition at the Time He Made Any Confession*

Defendant contends that the trial court should have instructed the jury that, in determining the weight and effect of any confessions, they should consider the question of defendant's mental condition at the time of such confessions. In the light of the entire record the subject was adequately covered by the instructions, which include the specific direction that the jury, in deciding whether the confessions were true, "should consider all the circumstances connected with the making of the statement, as shown by the evidence."

*Omission to Instruct that if the Jury Had a Reasonable Doubt as to Whether any Confession Was Voluntary, They Should Resolve Such Doubt In Favor of Defendant*

The trial court rejected defendant's requested instruction to the above effect. The refusal of the instruction, says defendant, improperly placed on him the burden of proving that the confessions were involuntary and was contrary to the general statement, quoted in *People* v. *Ralph* (1944), 24 Cal.2d 575, 581 [150 P.2d 401], that "the defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute." The requested instruction correctly states the law and might well have been given but, on the other hand, the jury were fully and correctly instructed as to the burden of proof and the doctrine of "reasonable doubt" as governing all issues of fact, and it cannot be reasonably concluded that the failure to give this particular instruction, specifically applying the general principles which were explained, resulted in a verdict different from that which would have been reached if the instruction had been given.

*Contention that the Instructions Assume that Defendant Committed Kidnaping for the Purpose of Robbery*

As to the counts which charge kidnaping for the purpose of robbery the court instructed the jury that "it will be your duty to determine whether the person or persons subjected to such kidnaping suffered bodily harm." These instructions, defendant urges, improperly assume and inform the jury that kidnaping for the purpose of robbery was established as a matter of law. If we were to consider the isolated portions of the instructions just quoted, they would be subject to this criticism. But, considering the instructions

as a whole—and the jury were told to so consider them—it does not appear that they could lead the jury to believe that the court was of the opinion, or intimated an opinion, that the crimes of kidnaping for the purpose of robbery had been established.

*Claimed Inadequacy of Instructions as to Specific Intent*

██ Defendant urges that the trial court, of its own motion, should have given more detailed instructions as to the specific intent to commit robbery which is an essential element of the crime of kidnaping for the purpose of robbery. The following adequate instructions were given: ''In the case of certain crimes it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed . . .

'' [I]n the crime of Kidnapping for the Purpose of Robbery, a necessary element is the existence in the mind of the perpetrator of the specific intent to commit robbery and unless such intent so exists that crime is not committed, but

''No actual robbery need be committed, as the Kidnapping is complete once the individual is seized for the purpose of robbery.''

Defendant, relying upon *People* v. *Snyder* (1940), 15 Cal. 2d 706, 708 [104 P.2d 639], urges that the instructions were insufficient because the jury were also instructed generally that ''To constitute criminal intent it is merely necessary that a person intend to do an act which, if committed, will constitute a crime,'' and that ''The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act.'' It is not reasonably probable that the latter instructions caused the jury to misunderstand the instruction as to the specific intent to rob. The Snyder case, which concerned materially different instructions and a materially different crime, does not apply here.

██ The trial judge instructed the jury that in prosecution for the various crimes here charged corroboration of the prosecuting witnesses was not required. This instruction was correct. The undisputed evidence shows that the female victims were not accomplices, but were acting in fear of their lives, in the violations of section 288a; therefore, corroboration of their testimony was not required. (*People* v.

*Featherstone* (1945), 67 Cal.App.2d 793, 796 [155 P.2d 685].) But, defendant argues, the instruction that corroboration was not required was equivalent to a direction to convict of the crimes charged, including those requiring specific intent, if the jury believed that defendant committed the overt acts to which the prosecuting witnesses testified; therefore, he says, the instruction permitted conviction without proof of specific intent. On no rational view of the instruction, either in or out of its context, could it have the meaning attributed to it by defendant.

### Instruction as to Flight

 Section 1127c of the Penal Code provides that, where evidence of flight is relied upon, the court shall instruct the jury substantially in language there set out. The trial court did so. Defendant argues that slight variations between the language of the statutory instruction and the language of the instruction here given are significant. This argument is elaborate but insubstantial.

### Instruction that Jury Disregard Instructions which Apply to Facts which They Find Do not Exist

 The court told the jury that "The applicability of some of these instructions will depend upon the conclusions you reach as to what the facts are. As to any such instruction, the fact that it has been given must not be taken as indicating an opinion of the court that the instruction will be necessary or as to what the facts are. If an instruction applies only to a state of facts which you find does not exist, you will disregard the instruction."

Defendant relies upon *People* v *Bodey* (1928), 94 Cal.App. 420, 423 [271 P. 203], where it is said that a similar instruction should not have been given; that it was confusing but not reversible error. It is defendant's position that under this instruction the jury could disregard any of the other instructions if they concluded that such instructions did not apply to the facts, whether such facts were legally proven or were the mere opinion of the jurors.

It does not appear that the instruction complained of is susceptible to an interpretation which would make it prejudicially erroneous. In *People* v. *Casey* (1926), 79 Cal.App. 295, 302 [249 P. 525], it was said of a similar instruction that "Although more apt language might well have been used, it appears that the meaning intended to be conveyed was merely this: That while certain rules of law had been stated,

the court did not wish to be understood as expressing any opinion upon matters of fact. It is obvious that whether or not legal principles announced are applicable to the facts of a particular case will often depend upon the jury's interpretation of the evidence." (See, also, *People* v. *Palmer* (1946), 76 Cal.App.2d 679, 686 [173 P.2d 680].)

*Attempted Rape and Forcing Victim to Violate Section 288a of the Penal Code as Infliction of Bodily Harm*

■ Bodily harm under section 209 of the Penal Code is defined in *People* v. *Tanner* (1935), 3 Cal.2d 279, 297 [44 P.2d 324] : "*Bodily harm* is generally defined as 'any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against his person.' " The trial court so instructed the jury; it further instructed them that both attempted forcible rape and compelling a violation of section 288a are "bodily harm."

Statements in *People* v. *McIlvain* (1942), 55 Cal.App.2d 322, 332 [130 P.2d 131], which tend to support defendant's argument that the commission of the sex crimes by threat of force did not amount to the infliction of bodily harm were disapproved in *People* v. *Brown* (1947), 29 Cal.2d 555, 560 [176 P.2d 929]. In the Brown case we reiterated the definition of bodily harm as quoted above from the Tanner case and declared that "The forcible rape itself was bodily harm." We note that the facts of the Brown case differ from those of defendant's case in that Brown actually struck his victim as well as raping her, but we hold that the rule of the Brown case is equally applicable here. It would belie sensibility and defame the *mores* of our age to hold that such treatment as the female victims received here is not the infliction of "bodily harm" within the meaning of section 209 of the Penal Code.

*Defendant's Contention that the Evidence Does Not Support the Determination that Crimes (8) and (11), Kidnapings, Were for the Purpose of Robbery*

■ On January 19, 1948, defendant stopped a car driven by him near a parked car occupied by Lea and Regina. He displayed a .45 automatic pistol and during the ensuing events repeatedly threatened to kill his victims if they did not obey his commands. Defendant took Lea's wallet, the keys to Lea's car, and Regina's purse. He then forced Re-

gina to walk 22 feet to the car he was using, to enter the car, and to violate section 288a. Another automobile approached. Defendant took $5.00 from Regina's purse, handed her the purse and Lea's keys, permitted her to get out of his car, and drove swiftly away.

On January 22, 1948, defendant approached a parked car occupied by Hurlburt and Mary, pushed a .45 automatic pistol through the door, and said, "This is a stick-up." Both victims replied that they had no money. Defendant then forced Mary to enter his car, drove to an isolated place, and compelled her to submit to sex crimes.

Defendant argues that the above summarized evidence at the most shows that he first robbed Regina and attempted to rob Mary, then abandoned his intent to rob and abducted the women with the sole intention of committing sex crimes against them. This argument is without merit. A defendant who engages in a course of conduct toward a female victim which includes robbery or attempted robbery, asportation of the victim, and the commission of sex crimes may present such argument to the trier of fact. But we cannot say as a matter of law that at some point of time during the abductions of his female victims defendant ceased to be a robber and became a kidnaper whose sole purpose was to inflict bodily harm by forcibly committing sex crimes. (See the following cases in which the described series of related criminal transactions were held to support a conviction of violation of section 209 of the Penal Code [kidnaping for the purpose of robbery in which the person kidnaped suffered bodily harm] : *People* v. *Kristy* (1935), 4 Cal.2d 504, 507 [50 P.2d 798] [robbery followed by abduction for the primary purpose of escape, during which the kidnaped persons suffered bodily harm] ; *People* v. *Dugger* (1936), 5 Cal.2d 337, 339 [54 P.2d 707] [defendant beat his female victim, dragged her around her house, attempted to rape her, and ransacked bureau drawers] ; *People* v. *Brown* (1947), *supra,* 29 Cal. 2d 555, 558 [defendant abducted a woman, raped her, then took her watch and automobile ; in the language of *People* v. *Knowles* (1950), *supra,* 35 Cal.2d 175, 185, "the taking of the wristwatch made the abduction kidnapping to commit robbery, even if the original objective were rape and the intent to rob was only an afterthought"] ; *cf. People* v. *Welsh* (1936), 7 Cal.2d 209, 212 [60 P.2d 124] [forcible abduction and attempted rape ; the defendant took a package of cigarettes from the woman's purse without taking the money which was in it or disturbing its

contents; held, this was not kidnaping for the purpose of robbery].)

Defendant urges that the words "This is a stick-up" do not show an intent to rob. This is their normal implication. Defendant's contention that in their context in the crimes against Hurlburt and Mary they show an intent to commit sex crimes is one of fact which should not be addressed to this court. In this connection defendant presents an elaborate discussion of the question whether it is permissible to base an inference on an inference. As stated in *Vaccarezza* v. *Sanguinetti* (1945), 71 Cal.App.2d 687, 698 [163 P.2d 470], "The statement appearing in some cases that an inference cannot be based upon an inference, usually without citation and certainly without adequate discussion, does not and cannot mean that an inference cannot be based upon a fact which is itself based upon circumstantial evidence. . . . The true rule is and should be that an inference cannot be based on an inference that is too remote or conjectural."

*Sufficiency of Evidence of Crimes (1), (9), and (10)*

Defendant's arguments in this connection can be answered by briefly stating the evidence which he says is insufficient. As to crime (1), robbery, the victim testified that defendant, displaying a .45 automatic, ordered him to surrender money and he, against his will, did so. The victim of crime (9), robbery, was unable to identify defendant positively; however, the crime was committed in a manner strikingly similar to that of other crimes where defendant was positively identified; furthermore, defendant confessed to this robbery. That the evidence of crime (10), attempted robbery, was sufficient appears from our summary thereof in connection with the kidnaping of Mary.

*Omission to Instruct as to Section 503 of the Vehicle Code (Taking an Automobile Without Owner's Consent)*

As to crime (2), grand theft of an automobile, there is ample evidence (the length of time and manner in which defendant used the car) to show that he intended to steal it. But, defendant says, the evidence would also permit the inference that he took the car with intent merely to deprive the owner of possession temporarily; i.e., the lesser offense of violation of section 503 of the Vehicle Code; and the jury should have been so instructed. In support of this contention defendant refers to the prosecuting attorney's argument that

"There are fellows like Chessman who are scouting around looking for a particular kind of car which they want to steal for a few days." If defendant wished to raise this contention, he should have requested an instruction as to the lesser offense and argued the matter to the jury. Furthermore, it does not appear that defendant returned, or at any time intended to return, the car to its owner.

*Asserted Violation of Section 1095 of the Penal Code*

Section 1095 provides, "If the indictment or information be for an offense punishable with death, two counsel on each side may argue the cause to the jury." After the prosecuting attorney concluded his opening argument the trial court of its own motion said, "So there will be no misunderstanding I am only going to allow one counsel to address the jury on each side . . . I am not going to permit . . . [Mr. Matthews] to argue, and then the defendant." This ruling was not literally a violation of section 1095, for defendant was not represented by counsel; he had conducted his own defense and Mr. Matthews had acted only as "legal adviser," not counsel.

Defendant contends that the ruling was prejudicial error because he wished to argue the facts to the jury but he wished Mr. Matthews, an attorney who could do so more effectively, to argue the law. It is for the court to decide questions of law and although it may permit counsel in argument to state correct law, and to discuss the application of the law to the facts, it may also refuse him permission to argue law. (See Pen. Code, §§ 1124, 1126, 1127, 1093, par. 6; *People* v. *Denomme* (1899), 6 Cal.Unrep. 227, 231 [56 P. 98]; *People* v. *Treadwell* (1886), 69 Cal. 226, 238 [10 P. 502]; *People* v. *Haney* (1920), 46 Cal.App. 317, 324 [189 P. 338]; and cases collected in 7 McKinney's New Cal.Dig., Criminal Law, §§ 624, 625.)

Furthermore, even if we assume that Mr. Matthews might have argued certain aspects of the facts as related to the law more skillfully than defendant, it appears that defendant by his insistence upon conducting his own case and refusing to appear by counsel has put himself in a position where he cannot complain of the trial court's ruling. He made no objection thereto in the trial court; also, as stated, he was not represented by "counsel" at all. Unless a party authorizes an attorney to represent him he is not entitled to have the attorney speak for him. There was no error in refusing to

permit the consulting but nonrepresenting attorney to argue the case.

*Argument of Prosecuting Attorney and Instructions to Jury as to Meaning of Life Imprisonment Without Possibility of Parole*

The prosecuting attorney argued that "punishment for life imprisonment without possibility of parole does not mean what it says. Those are the words that are used in the statute defining the punishment, but that is not what it means," because of the possibility of pardon, commutation or the Legislature's changing the penalty. Furthermore, he repeatedly commented that defendant "hasn't much to lose if you just convict him of robbery. Robbery doesn't mean a thing to him. No. To convict him of robbery is just like you going home. Time means nothing to him."

The jury were apparently impressed by this argument, for after they had deliberated for a time they returned into court and requested instruction as to the meaning of life imprisonment without possibility of parole. The trial court said, "that primarily means that the person committed to prison under such a sentence will be required to serve life imprisonment in prison, and can not be paroled," and explained that a person sentenced to life imprisonment for murder, for example, could be paroled. It went on to say further, however, as the prosecuting attorney had in his argument, that there was always a possibility of commutation, pardon, or a legislative change in punishment.[4] A juror asked whether, if the punishment of life imprisonment without possibility of parole were imposed, "would there be any assurance that that party would never be free again?" and the court again pointed out the possibility of action by the governor or the Legislature.

This insistence of the trial court in emphasizing such possibilities operated to his prejudice, defendant says, and resulted in the imposition of the death penalty. He relies upon such cases as *People* v. *Ramos* (1935), 3 Cal.2d 269, 272 [44 P.2d 301], and *People* v. *LeTourneau* (1949), 34 Cal.2d 478, 494 [211 P.2d 865], in support of his contention that the trial court should not have discussed the matter with the jury and should not have permitted the prosecuting attorney to argue it.

The statements of which defendant complains relate solely to the question of punishment for the crime of kidnap-

---

[4] As will appear *infra*, p. 191, the Legislature since the date of trial of this case, has made such a change in punishment.

ing for the purpose of robbery where the victim suffers bodily harm, a question which is addressed to the discretion of the jury. (Pen. Code, § 209.) It is clear from the colloquy between the jurors and the judge, and from the verdicts subsequently arrived at, that it was this question which they were considering when they returned to court for further instructions. They must already have tentatively determined that the kidnaping victims had correctly identified defendant and drawn the permissible inferences that the kidnapings were within section 209 before they reached the question of the meaning of imprisonment without possibility of parole. Thereafter they exercised their discretion with discrimination, for they determined that the type of bodily harm inflicted upon defendant's female victims deserved a more severe punishment than the type of bodily harm inflicted on Waisler, victim of the ordinary kidnaping-robbery which constituted crime (16). "It is understandable that jurors, who are charged with the duty of fixing the penalty in the event that they find a defendant guilty . . ., should be interested in knowing the nature and effect of the penalties which they may impose; and neither reason nor authority indicates that the trial court should be prohibited from enlightening the jurors when questions are asked upon that subject." (*People* v. *Osborne* (1951), 37 Cal. 2d 380, 384 [231 P.2d 850].) Upon the circumstances shown here, there was no error in this respect.

*The Holding of People* v. *Knowles (1950), supra, 35 Cal.2d 175, 179, that Detention During Armed Robbery Is Kidnaping for the Purpose of Robbery as Defined by Section 209 of the Penal Code, and the 1951 Amendment of Section 209*

Defendant asks that this court reexamine its holding in *People* v. *Knowles* and overrule that case. His arguments are those advanced in the dissenting opinions of the Knowles case, and those rejected in *People* v. *Tanner* (1935), *supra,* 3 Cal.2d 279, 293-298. They were ably presented in those cases, we considered them with care, and we view the question as resolved insofar as concerns the statute as it was cast prior to the 1951 amendment.

As stated in the Knowles case (pp. 180, 183, of 35 Cal.2d), if section 209 was regarded as too harsh, the remedy was for the Legislature to change it, not for this court to change the plain language of the section by "interpretation."

The Legislature has seen fit to make such a change. At the time of the Knowles decision section 209 (as amended in 1933 to define detention for armed robbery as kidnaping) provided in material part that "Every person who . . . holds or detains . . . [another person] to commit . . . robbery . . . shall suffer death or shall be punished by imprisonment in the State prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person . . . subjected to such kidnaping suffers . . . bodily harm . . ." As amended in 1951 section 209 provides in material part, "Any person . . . who kidnaps or carries away any individual to commit robbery . . . shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person . . . subjected to such kidnaping suffers . . . bodily harm.

"Any person serving a sentence of imprisonment for life without possibility of parole following a conviction under this section as it read prior to the effective date of this act shall be eligible for a release on parole as if he had been sentenced to imprisonment for life with possibility of parole."

The detention of the victim during the commission of armed robbery, if committed since the 1951 amendment, is not punishable under section 209. Furthermore, under that amendment, all persons (such as Knowles) held under sentences of life imprisonment without possibility of parole for violations of section 209 prior to the amendment, are now eligible for parole. Defendant urges that the 1951 amendment also shows a legislative intent that the crime of armed robbery, committed after the 1933 amendment and prior to the later amendment, should not be punishable under section 209; that this legislative intent applies retrospectively to offenses which were committed before the 1951 amendment, but as to which judgment of conviction has not yet become final. If defendant were sentenced to suffer the death penalty for conduct amounting to no more than robbery with infliction of bodily harm, his argument would be relevant. (See *Sekt* v. *Justice's Court* (1945), 26 Cal.2d 297, 305 [159 P.2d 17, 167 A.L.R. 833], citing cases from other jurisdictions which hold that, where a statute mitigating punishment is enacted after commission of the offense but before final judgment of conviction, "the offender who commits an offense before the amendment of the statute imposing the lighter sentence gets the benefit of the lighter punish-

ment, upon the ground that it must have been the intention of the Legislature that the offender should be punished, and, since he can be constitutionally punished under the new statute, that should be done''; *cf. In re Fisher* (1934), 1 Cal.App. 2d 449 [36 P.2d 841]; *In re Eyre* (1934), 1 Cal.App.2d 451 [36 P.2d 842], which hold that an amendment reducing punishment was prospective in its operation and did not aid a prisoner as to whom judgment of conviction became final before the amendment.) But the offenses for which defendant received the death penalty here were not mere armed robberies. Defendant by threat of force transported his female victims—Mary for a considerable distance in defendant's car, Regina from the car of Lea to the car of defendant—pursuant to a plan which purposed the commission of robberies and the infliction of bodily harm (the sex crimes). The fact that Regina in being kidnaped or carried away was forced to move only 22 feet does not make her abduction any the less kidnaping within the meaning of the statute. She was taken from the car of her chosen escort, and from his company, to the car of defendant and into the latter's company and there detained as a virtual prisoner and forced to submit to his demands. It is the fact, not the distance, of forcible removal which constitutes kidnaping in this state. (*People* v. *Raucho* (1935), 8 Cal.App.2d 655, 665 [47 P.2d 1108] [held, as alternate ground of decision, that forcing victims to cross street and enter automobile constituted ''kidnaping and carrying away'']; *People* v. *Cook* (1937), 18 Cal.App.2d 625, 627 [64 P.2d 449] [dragging victim from sidewalk into adjacent house constituted kidnaping]; *People* v. *Melendrez* (1938), 25 Cal. App.2d 490, 494 [77 P.2d 870] [defendants forced victim to walk 50 to 75 feet; held, they ''committed an act of kidnaping'']; *People* v. *Shields* (1945), 70 Cal.App.2d 628, 630 [161 P.2d 475] [evidence that defendant carried child from front of house to roof supported conviction of kidnaping]; *People* v. *Oganesoff* (1947), 81 Cal.App.2d 709, 711 [184 P.2d 953] [evidence that defendant forcibly carried victim from automobile in front of his house into the house supported conviction of kidnaping]; see *Cox* v. *State* (1931), 203 Ind. 544, 550 [177 N.E. 898, 181 N.E. 469] [carrying child 90 feet was within statute which denounced forcibly carrying a person ''from any place within this state'']; *State* v. *Taylor* (1940), 70 N.D. 201, 209 [293 N.W. 219] [victim compelled to drive defendant in victim's car for a very short distance; ''Where asportation is charged, the distance removed is not material''].)

 Because the conduct which resulted in the two death sentences is conduct which remains punishable by death, at the discretion of the jury, since the 1951 amendment of section 209, there is no occasion for reversal or modification of those sentences because of that amendment.

### Double Punishment and Double Jeopardy

 Defendant has not been put twice in jeopardy for any offense. The doctrine of double jeopardy has no application to a defendant who is tried but once on several counts. (*People* v. *Amick* (1942), 20 Cal.2d 247, 251 [125 P.2d 25].) Defendant is correct in his contention that punishing him separately for the violations of section 209 of the Penal Code (kidnaping) and for the robberies and sex crimes which, under the circumstances here, are essential parts of those violations, would amount to double punishment, which is forbidden by section 654 of the Penal Code. (*People* v. *Knowles* (1950), *supra*, 35 Cal.2d 175, 189; *In re Shull* (1944), 23 Cal.2d 745, 750 [146 P.2d 417].) However, since defendant is subject to two validly imposed death sentences, no purpose would be served by reversal of other judgments of conviction. (*People* v. *Smith* (1950), 36 Cal.2d 444, 448 [224 P.2d 719].)

For the reasons above stated, the judgments and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

Because, as was pointed out in the dissenting opinions of Mr. Justice Edmonds and myself in *People* v. *Chessman*, 35 Cal.2d 455, 468, 469 [218 P.2d 769, 19 A.L.R.2d 1084], there is no adequate record upon which this court may review the judgments of conviction against the defendant, I would reverse said judgments and order denying defendant a new trial on that ground alone. A reading of the majority opinion, however, convinces me that many flagrant errors were committed during the trial which would ordinarily be held to be prejudicial and require the reversal of a judgment of conviction. In fact, the only way I can rationalize the majority opinion is that those concurring therein feel that a person charged with 17 felonies of the character of those charged

against the defendant, and who represents himself, is not entitled to a trial in accordance with the rules applicable to the ordinary criminal case. I cannot subscribe to this doctrine.

EDMONDS, J.—The judgments of conviction, including two which carry a sentence of death, are affirmed upon a record which, admittedly, is not a complete transcript of the proceedings before the trial court. As I pointed out in *People* v. *Chessman*, 35 Cal.2d 455, 470 [218 P.2d 769, 19 A.L.R.2d 1084], the transcript omits certain pertinent testimony and was made up in a manner which does not comply with the Rules on Appeal. It was certified by the trial judge as a substitute for a correct record and was considered by him ". . . as the basis of establishing a transcript on appeal."

Manifestly, this court could not make "an examination of the entire cause, including the evidence" as required by the Constitution (Const., art. VI, § 4½) without "the entire record of the action" to which the appellant is entitled. (Rules on Appeal, rule 33, subd. c.) Notwithstanding these provisions, in the absence of a showing by the appellant that he has been prejudiced by omissions and inaccuracies in the record, the approximate and inexact transcript is held to be a sufficient basis for reviewing the judgments of conviction. Such procedure, in my opinion, has taken from Chessman a substantial right.

For these reasons, and without considering other points presented by the appellant, I would reverse the judgments of conviction and remand the cause for a new trial.

A petition for a stay of remittitur and appellant's petition for a rehearing were denied January 15, 1952. Edmonds, J., and Carter, J., were of the opinion that the petition for a rehearing should be granted.